UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

U.S.A.,

-against-

TERRY J. ALBURY,

Defendant.

18 CR 67 (WMW)

# POSITION ON SENTENCING
# ON BEHALF OF TERRY ALBURY
# REDACTED

JaneAnne Murray, Esq.
Minnesota Bar #: 0384887
Murray Law LLC
310 South Fourth Avenue, Suite 5010
Minneapolis, MN 55415
Tel: (612) 339-5160
Fax: (866) 259-7819
Email: jm@mlawllc.com

Joshua Dratel, Esq.
New York State Bar #: 1795954
Law Offices of Joshua L. Dratel, P.C.
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-0707
Fax: (212) 571-3792
Email: jdratel@joshuadratel.com

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................ 1

II. BACKGROUND ........................................................ 5

A. Parental Background and Childhood ........................................................ 5

B. Education ........................................................ 6

C. Mr. Albury's Sixteen-year Career with the FBI ........................................................ 11

D. Marriage and Family ........................................................ 28

E. Dr. Sachs' Psychological Evaluation ........................................................ 30

F. Offense ........................................................ 36

G. Acceptance of Responsibility ........................................................ 37

III. ANALYSIS OF 18 U.S.C. § 3553 FACTORS ........................................................ 38

A. Applicable Principles ........................................................ 38

B. The Applicable Sentencing Guideline ........................................................ 40

C. Nature and Circumstances of the Offense ........................................................ 47

D. Mr. Albury's History and Characteristics ........................................................ 51

E. The Purposes of Sentencing ........................................................ 54

IV. CONCLUSION ........................................................ 70

APPENDIX OF ATTACHMENTS

Exhibit A. Psychiatric Report of Dr. Emily Sachs (filed under seal)
Exhibit B. Awards
Exhibit C. Draft White Paper
Exhibit D. Letters of Support

Defendant Terry Albury respectfully submits this sentencing memorandum. Mr. Albury pleaded guilty to two counts of 18 U.S.C. § 793(e), Unauthorized Disclosure of National Defense Information and Unauthorized Retention of National Defense Information, respectively. The Probation Department and the government estimate his applicable advisory sentencing guideline to be 46 to 57 months. We submit that the correct advisory guideline is 36 to 47 months. Whatever Guideline the Court decides is appropriate, we write to request that the Court grant Mr. Albury a substantial variance and/or downward departure and impose a non-custodial sentence. As detailed below, Mr. Albury is a paradigmatic candidate for a below-guidelines sentence.

In 2016, Terry Albury, a highly-regarded and decorated FBI agent in the Minneapolis office (and who had previously served the FBI in Iraq), and the only black field agent in his region at that time, disclosed classified materials to a reporter relating to FBI surveillance, profiling, and informant-recruitment practices in national security cases. He did so as an act of conscience, of patriotism and in the public interest, and for no personal gain whatsoever. In fact, in 2017, when his offense was discovered, he was fired. He pled guilty in March 2018, pursuant to a plea agreement that saved the government the effort of even an indictment, much less litigation and a trial.

As detailed below, throughout his life Mr. Albury has been a model student, citizen, and law enforcement professional. The child of an Ethiopian political refugee, raised with a strong sense of social justice and appreciation of the rule of law, he attended a charitable boarding school in the hills of Kentucky, and later, Berea College, where he worked on weekends as a big brother to Appalachian children in unstable homes.

A driven and dedicated student, Mr. Albury interned one summer with the FBI, and the experience inspired him to pursue a career as a Special Agent. Straight out of college, he worked for three years as an Investigative Specialist. Thereafter, he went through the training at Quantico, and graduated as an FBI Special Agent in 2005. He served in San Francisco, San Jose, and Iraq, finally moving to Minnesota in 2012 with his family, where he was assigned to the terrorism squad. He was the consummate professional -- reserved, thoughtful, careful, meticulous. His work garnered numerous awards.

Why would someone with such a stellar career, a history of probity, young children, and just three years from a pension, jeopardize all he had? The answer lies in the FBI's own checkered history with race -- a history that FBI Director James Comey acknowledged in several speeches in 2015 and 2016 had generated a "crisis" in the Bureau. The FBI's crisis was not just the lack of diversity in its approximately 80% male and white Special Agent workforce, but also in its capacity to act with integrity towards the communities it is sworn to protect. It was no accident that after Mr. Comey's public recognition of the problem, FBI spokespeople talked of the FBI striving to "look like" the communities it served. In an increasingly tribal world, it is all the more important that the guardians are viewed as non-partisan, as conflict-resolvers, as fair arbiters.

But when Mr. Albury joined the FBI in 2001, Director Comey's progressive remarks were a decade and a half away. That year, the FBI was scrambling to increase its appalling 5.5% proportion of black agents in response to a revived lawsuit and the appointment of an outside monitor. After September 2001, it was forced to refocus much of its resources to address an unprecedented domestic terrorism threat. As recent reports indicate, the FBI's efforts in both endeavors have fallen far short. The percentage of black agents today has, in

fact, declined to 4.4%. In the absence of sustained mentoring, support, and training, long-term recruitment and retention of minority staff has been an uphill battle, while leaving the minority members already in the organization isolated, marginalized, and worn down psychologically. On the policing front, studies have established that surveillance, targeting and profiling of minority communities simply further alienates them and ultimately ends up being counter-productive.

Mr. Albury existed in the eye of this storm. He first worked in Northern California, the jurisdiction that came under sustained attack for its profiling and surveillance post 9-11. He later did a stint in Iraq for FBI, which further exposed him not only to anti-Muslim and anti-Iraqi sentiments by U.S. personnel there, but also to the effect of the U.S.'s counterterrorism approach on the communities these programs were supposed to be aiding. Ultimately, Mr. Albury moved to Minnesota, just as young men were flying to join Al Shabaab and later ISIS, and when the FBI office here was accused of adopting the discredited Northern California playbook of using community outreach as a front for intelligence gathering.

As the only black field agent for most of his five years on the FBI Minneapolis terrorism squad, Mr. Albury felt increasingly isolated and sickened by the racism he experienced within and without his squad. He grew depressed, anxious and lonely. Hearkening back to his days at Berea College where he had researched and presented a thesis on community policing, he wrote a "White Paper" explaining the importance of the "beat cop" in the domestic terrorism context. He considered presenting it to his superiors, but several incidents convinced him that it would fall on deaf ears and potentially brand him as a traitor not worthy of protection in a crisis. He abandoned the endeavor, and as his tension and moral conflict grew, he elected the path leading to the instant offense.

As discussed below, there are several reasons why, after applying the sentencing factors enumerated in 18 U.S.C. §3553(a) to Mr. Albury, a non-custodial sentence is appropriate and reasonable in this case:

(1) Although serious, Mr. Albury did not disclose, or intend to disclose, classified information that jeopardized U.S. security. Rather, the documents at issue advanced the discourse necessary in a free society about how to maintain the delicate balance between freedom and security.

(2) Mr. Albury acted solely out of concern for the public good. He did not seek or intend any personal gain from his conduct. He was endeavoring to resolve what for him became an insurmountable moral conflict between his role as an FBI agent sworn to uphold the written law and his personal commitment to social justice and human rights.

(3) Mr. Albury has two children aged 8 and 4, who will be devastated by a separation from him.

(4) The purposes of sentences are ill-served here by a sentence of incarceration. There is no possibility that Mr. Albury will repeat this crime (he has been fired and will never get another security clearance), and his background demonstrates that there is no danger that he will commit any crime in the future. Mr. Albury does not need to be incapacitated to protect the public. And his punishment thus far (firing, loss of pension, preclusion from many professions, felony conviction) has already been severe.

(5) The disparities in the selective enforcement of the Espionage Act, and unauthorized disclosures of classified information – as well as punishment

for such conduct —make a sentence of imprisonment for Mr. Albury disproportionate. Those disparities also render this case inapposite for achieving any measure of general deterrence in light of the vast gulf in treatment of such disclosures.

## FACTS

### I. Background

#### A. Parental History and Childhood[1]

Terry Albury was born on [******], in Santa Rosa, California, to James Albury, an auto mechanic, and Addis (Arlene) Hiyot Dirasse Albury, a local government book-keeper. His mother had immigrated to the United States from Ethiopia in 1975, following the communist overthrow of Emperor Haile Salassie. Her father, Dirasse Dubale, a general in Salassie's army, was executed in what became known as the "Massacre of the Sixty."[2]

Other members of his mother's family were imprisoned at the time, including Mr. Albury's grandmother, who was imprisoned for eight years, and his uncle, who was imprisoned for two and one half years. It was an early experience of violence and civil unrest that seared in the consciences of Mr. Albury's mother and her children the importance of sustained and meaningful adherence to democratic values. It also forged the family's gratitude to the United States, which granted refuge not only to Arlene Dirasse, but also, upon their release, to her mother and her brother.

Mr. Albury and his two siblings were raised in the Berkeley/Oakland area - his mother often working long hours to make ends meet. [*******

[1] This statement of facts is based on the presentence report ("PSR"), the report of Dr. Emily Sachs ("Sachs Report") (Exhibit A), information provided by Mr. Albury, counsel's independent investigation, and documents

[2] *See* https://en.wikipedia.org/wiki/Massacre_of_the_Sixty.

**************

]Relations between his parents were tense. Family members describe Mr. Albury as a quiet and sensitive boy, with considerable empathy for anyone who was hurt or vulnerable.[3] Eventually, when Mr. Albury was 13 years old, his mother sent all three children to a boarding school in Virginia, [***************************] and to shield them from gang violence in the street.

B. Education

From 1993 to 1997, Mr. Albury attended Mountain Mission School in Virginia, a "charity functioning as a full child care facility (home, church, school) for children with legitimate needs regardless of the child's race, age, color, or creed," and which required students "to reside on campus for a minimum of ten months annually."[4] In the entrance application, Mr. Albury's mother listed Mr. Albury's special abilities to include "ability to listen well and follow instructions, ability to empathize, gets along well with others."[5] She explained her reasons for transferring him to the school as follows: "The child needs the care of a school with a Christian outlook. He needs to be in a clean, spiritually wholesome, drug and crime free environment. He needs a place where he can learn and grow unhindered by fear and negative social pressures. He can also benefit a lot from the good educational foundation he can get from Mountain Mission School."[6]

While attending this school, Mr. Albury and his siblings stayed in the campus dorms nearly year round and made limited trips back home to California. Although the Alburys had

[3] *See* Letters attached as Exhibit D.
[4] PSR ¶ 65.
[5] *Id.*
[6] *Id.*

family living locally, those relatives' home was small and it was not feasible for the Albury children to spend more than a few nights there.

Mr. Albury's parents did not visit (they could not afford to), and mid-way through his schooling there, he learned that his parents had divorced. As he explains, the abrupt rupture from his home life to a boarding school environment caused him to "grow up fast." Despite the emotional isolation of the experience, Mr. Albury thrived at Mountain Mission, graduating with mainly A's in his senior year, along with the citizenship award, computer science academic award, sacred literature academic award, and president's award for educational improvement.[7]



*Mr. Albury (far left, front row) with his graduating class from Mount Mission School*

Former classmates write about Mr. Albury's groundedness and focus during these years. Girum Tesfaye writes how he witnessed Mr. Albury's transformation into a "thoughtful" and "muted academic," "grounded in temperament," "resist[ing] peer pressure,"

[7] PSR ¶ 65.

who guided others by way of the example he set.[8] Lula Ahmed describes him as someone with "a strong sentence of community," "generous with his time," who "never left anyone behind."[9] She struggled with Algebra and he would tutor her, as he would younger students.[10] The school's Vice President, Ernest Hertzog, recalls that Mr. Albury "was one who would go the extra mile beyond what was required. He spent his time tutoring classmates, playing with the younger boys on campus, and encouraging others."[11]



[8] *See* Letter from Girum Tesfaye.
[9] *See* Letter from Lula Ahmed
[10] *Id.*
[11] *See* Letter from Ernest Hertzog.

Terry Albury, also known as "Mr. Conservative", has shown that hard work does pay off. His study skills, respectful attitude, trustworthiness, and helpfulness have proven him to be a fine young man. Terry's best memort of MMS is the first time he waterskied across the lake on an A.C. retreat and also the first time he experienced snow of which there is none in Santa Rosa, California, where he was born. Terry has grasped the oppertunities around him and put them to work for him. His future plans are to work during the summer and to attend Elon or Berea College in the fall, majoring in physical therapy. He says, "Don't let what others say about you get you down. Strive towards perfection in all you do and never give up on yourself."

*Photograph and Caption in Mr. Albury's High School Yearbook*

After graduating high school, Mr. Albury attended Berea College in Berea, Kentucky, a "tuition free" college based on scholarships and work-study programs. He was one of 20 students of color in a college with an enrollment of 1500 students. Although he endured several direct experiences of racism, including slurs and threats from people in the local town, he took to heart his mother's advice -- "endure, realize your goals, and don't be side-tracked" -- and immersed himself in his studies and extra-curricular activities.[12]

At Berea, Mr. Albury mentored poor Appalachian children from unstable backgrounds through a Big Brothers/Big Sisters program. It was this experience that inspired him to pursue a career in law enforcement, with a view to strengthening communities to direct struggling young people away from gang affiliation, crime, and exploitation. He graduated from Berea College in May 2001 with an honors degree in sociology. The Berea College website notes that he won a social science scholarship in 2001[13] and that his senior thesis was an in depth empirical analysis of the Berea Police Department's Community Policing Initiative.[14]

---

[12] *See* Sachs Report at 2.
[13] *See* https://www.berea.edu/psc/awards/.
[14] *See* https://www.berea.edu/soc/learning-opportunities/.




*Mr. Albury with Co-Student-Workers at Berea College*

His friends from Berea speak uniformly of Mr. Albury as a hard-working student of integrity. Akili Ujima writes he was "a man of drive, integrity and determination," who announced to Mr. Ujima in 1997 that he planned to become an FBI agent to put a stop to sex trafficking.[15] Felemon Belay describes "a responsible leader who would volunteer on campus and try to help other young students," who was "so dedicated to his education and driven to create a bright future for himself" that he was "on the Dean's List regularly and recognized by his professors as a great student."[16]

His teachers there shared this admiration for Mr. Albury. Jacqueline Burnside, Professor of Sociology, writes that Mr. Albury "was a very attentive and conscientious student who excelled," and that she has used his life narrative to accomplishing his dream of becoming an FBI agent "as a testimony that through perseverance and hard work, one can overcome their life's obstacles and challenges."[17] Sociology Professor Jill Bouma recalls him as "an

[15] *See* Letter of Akili Ujima.
[16] *See* Letter of Felemon Belay.
[17] *See* Letter of Jacqueline Burnside.

excellent, engaged, and thoughtful student . . . [b]right, energetic, and inquisitive, [who] exuded enthusiasm for learning."[18] He was, she adds, "one of the class leaders, and recalls that "once when students were getting quite agitated during a debate, Terry was the one to gently redirect the discussion in ways that allowed all voices to be heard and respected all points."[19]

Retired Sociology Professor Thomas Boyd describes Mr. Albury as "a young man of great intelligence, with a passion for justice, and possessing exemplary moral judgment."[20] He notes that Mr. Albury "was interested in public service" and when he returned from "an extremely competitive summer internship training experience with the FBI in Washington D.C., . . . he believed he had found an organization in sympathy with his own high values."[21]

C. Mr. Albury's Sixteen-Year Career with the FBI

1. FBI Internship, Investigator and Special Agent in California

In the summer of 2000, while still enrolled in Berea College, Mr. Albury worked as an Honors Intern in the FBI's Crimes Against Children Unit, working on cases related to violent child sexual abuse and child sex tourism. He returned to Berea to complete his senior year, and, inspired by his summer internship, applied and was hired for a position as Investigative Specialist with the FBI. His ten-week training commenced in September 2001, and thereafter, he was assigned to the San Francisco Bay area, where he primarily conducted surveillance on individuals suspected of terrorism activities.

It was a unique time to be employed as a person of color with the FBI. In 1991, a group of black agents had sued the FBI, alleging systemic discrimination by the bureau in the distribution of high-profile assignments, performance reviews, rates of promotions and

---

[18] *See* Letter of Jill Bouma.
[19] *Id.*
[20] *See* Letter of Thomas Boyd.
[21] *Id.*

findings of misconduct.[22] A federal judge ultimately concluded there was "statistical evidence" of discrimination at the FBI, and a settlement was reached in 1993 promising reforms.[23] But the plaintiffs returned to court in 1998, asserting the FBI had failed to deliver on its promises, and in 2001, another settlement was achieved.[24] That agreement for the first time mandated that an outside mediator be used to handle future discrimination complaints at the bureau.[25]

In addition, immediately after 9-11, anti-Muslim sentiments were pervasive, and the FBI had adopted investigatory and surveillance tactics that generated widespread opposition among Muslim communities. As litigation later uncovered, the FBI routinely profiled Muslims in Northern California during the mid-200's, including, for example, by attending meetings and religious services for the purpose of documenting and disseminating names of attendees and their associations and affiliations, and the contents of sermons, speeches or conversations.[26]

Mr. Albury was on the frontlines administering these strategies in his role as an Investigator Specialist. But despite his misgivings with his role, he was not deterred from his dream of becoming an FBI agent. He viewed Special Agents as sophisticated professionals operating above individual biases and prejudices. He applied to and was accepted into the Special Agent training program, and commenced his period at Quantico in April 2005. Upon

---

[22] Eric Lichtblau, *FBI Settles Black Agents' Discrimination Lawsuit*, L.A. TIMES, May 1, 2001, available at http://articles.latimes.com/2001/may/01/news/mn-57894.
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *See*, *e.g.*, Maria L. La Ganga, *FBI Documents Reveal Profiling of N. California Muslims*, L.A. TIMES, Mar. 28, 2012, available at http://articles.latimes.com/2012/mar/28/local/la-me-fbi-california-mosques-20120328 (indicating that federal agents routinely profiled Muslims in Northern California, using community outreach as a cover for compiling intelligence on local mosques); Devon Chaffee, *Members of Congress Urge Investigation of FBI Muslim Surveillance*, ACLU.org, June 7, 2012, available at https://www.aclu.org/blog/national-security/discriminatory-profiling/members-congress-urge-investigation-fbi-muslim (22 Congressional representatives demand investigation into FBI's use of community outreach for intelligence purposes).

graduation, he was assigned to the white collar crime squad in the San Francisco Bay area for a few months before spending six years in the terrorism squad in San Jose.

During his period in San Jose, Mr. Albury grew increasingly troubled by the FBI's approach to counter-terrorism enforcement. He was under constant pressure to bolster the squad's number of active investigations and informants, irrespective of the threat level posed by the individuals in question.

Cases were opened on thin or non-existent evidence, but when Mr. Albury protested, he was told that the degree of predication was not his concern. As the squad's case numbers increased, so too did Mr. Albury's concerns that the factual bases of those cases were highly unethical, *i.e.*, based on information from informants who were known to be unreliable or deceptive.

When oral reports to his supervisors did not produce any remedial measures, Mr. Albury voiced his unease in the closing statements of his reports, but at no point were his concerns addressed. At this point, he began to feel personally responsible for, and thus deeply conflicted by, his participation in surveillance of civilians that he viewed as unduly invasive and harassing. His distress at the nature of the work he observed and participated in was compounded his co-workers' coded statements about Hispanics and African-Americans, with the caveat expressed to Mr. Albury that he should not be offended because he was "different" and not like "those other black people."

Nevertheless, during this period, Mr. Albury won several awards:[27]

- September 27, 2006: FBI Counterterrorism award for Strategic Islamic Source Development.

[27] *See* Annexed awards at Exhibit B.

- March 1, 2007: FBI award from Director Mueller for Special Efforts in a major Terrorism Investigation.
- July 31, 2009: FBI award from Director Robert Mueller for outstanding efforts, contributions and professionalism to San Jose Terrorism Squad CT-7.

2. Iraq Deployment - December 2009 to April 2010

In December 2009, Mr. Albury elected to serve an FBI deployment in Iraq. He hoped by engaging in counter-terrorism work abroad, he would at least temporarily escape the moral conflict he experienced in his work in the U.S., arising from concerns that people were being investigated and targeted without appropriate justification. He was aware of earlier reports of detainee abuse by military and CIA personnel abroad, but believed that FBI presence would ensure greater conformity with the rule of law.

Inexperienced in a war-torn environment, where direct and indirect mortar fire was a regular occurrence, Mr. Albury lived in a constant state of fear. Moreover, the moral conflicts did not abate. He frequently witnessed deep animus held by U.S. personnel toward Iraqis, and, on more than one occasion, believed that that he was complicit in acts of torture.

He recalls one instance when he went to a prison camp in Iraq to interview a detainee who was accused of killing U.S. soldiers. Mr. Albury interviewed him over several days, but the efforts proved fruitless. He expressed frustration to a military officer, who assured him that the prisoner would be more cooperative at the next interrogation. A few days later, as promised, the detainee was considerably more talkative and provided more information than in the past. Mr. Albury came to believe that the prisoner's new-found volubility was due to torture and that he, Mr. Albury, was directly responsible for such torture.

On another occasion, Mr. Albury was assigned to interview a detainee brought to a building by CIA officers who were working with the Iraqi Special Forces. The goal was to address the detainee's alleged contacts in a certain U.S. city. The detainee was brought in, shackled from head to toe, masked and blindfolded with black goggles over his blindfold, and in an orange jumpsuit. He vividly recalled that the man moved as if he was in pain, and the sound of shuffling and shackles as he entered the room reminded him of Guantanamo prisoners. Mr. Albury came to believe that this man had been or would be the subject of torture.

In April 2010, Mr. Albury was given the following award from FBI Legal Attache Michael Dorris:

- Award in appreciation of your commitment, dedication, and personal sacrifice to safeguarding citizens of the United States from acts of terrorism and carrying forward the FBI mission in Iraq.[28]

Upon his return to the United States, however, Mr. Albury, haunted by the terrors and disillusionment of his Iraq deployment, experienced feelings of depression, anger and fear. He sought a reassignment out of the terrorism squad, and was eventually assigned to work on organized crime and extortion in the Vietnamese community in San Jose. He earned two additional awards during this period for his work as a Special Agent in California:[29]

- June 24, 2010: FBI award from Special Agent in Charge Stephanie Douglas for superior service rendered to the FBI.

[28] *See* Annexed awards at Exhibit B.
[29] *Id.*

- 2010: United States Intelligence Community meritorious citation for exceptional service from June 2005 to September 2007 on the Domestic Melee Counterterrorism Task Force.

3. Terrorism Squad in Minnesota

Following his stint in the violent crimes squad in San Jose, Mr. Albury sought and was granted a transfer to the FBI office in Minneapolis, where -- despite his requests for the violent crime or sex trafficking squads -- he was assigned to the terrorism squad. Arriving in 2012, the conflicts Mr. Albury had previously experienced in his years in the FBI in California – were not ameliorated. Rather, they became even more pronounced.

During his FBI employment in Minnesota (from 2012 to 2017), Mr. Albury was the only black field agent in the region, apart from one year, when there was one other black agent on the terrorism squad (that agent later transferred to D.C.).[30] In fact, throughout this period, the Minneapolis field office was 80% white and male, a statistic that just recently has become the focus of a formal and sustained diversity recruitment effort.[31] This lack of diversity is starkly illustrated in these two photos, one from 2011 and one from 2013, featuring the Minneapolis terrorism squad with FBI Directors Robert Mueller and James Comey, respectively.

---

[30] In addition to Mr. Albury and the black agent assigned to the squad for one year, there were also two supervisory agents, who did not work in the field, and who were not in Mr. Albury's chain of command. One was a "Supervisory Special Agent," who worked in that capacity throughout Mr. Albury's entire time in the Minneapolis office. The other was an Assistant Special Agent in Charge, who worked in the office for one year prior to taking a transfer to D.C. For most of his time in Minnesota, Mr. Albury was the only black field agent in the office.

[31] *See* Stephen Montemayor, *FBIs' Minneapolis Office to Make Diversity Recruitment Push this Summer*, STAR TRIBUNE, June 15, 2018, available at http://www.startribune.com/fbi-s-minneapolis-office-to-make-diversity-recruitment-push-this-summer/485694322/; Stephen Montemayor, *FBI, Known for Men in Suits, Aims for Greater Diversity*, STAR TRIBUNE, June 15, 2017, available at http://www.startribune.com/fbi-known-for-men-in-suits-aims-for-greater-diversity/428072033/.

*FBI Director Robert Mueller with Minneapolis Terrorism Squad (2011)*

*Mr. Albury Pictured with FBI Director Comey (2013)*

Indeed, in a speech in 2015, FBI Director Comey described the diversity issue in the FBI as "a crisis," noting that "slowly but steadily over the last decade or more, the percentage of special agents in the FBI who are white has been growing."[32] Although a decade ago, 6.5% of special agents were black, today, that figure is down to 4.4% (despite the fact that African-Americans make up 12% of the population).[33] It is lower today than it was in 1991, when the discrimination lawsuit was filed leading to the appointment of an outside monitor in 2001 - the year Mr. Albury was first hired by the FBI.[34] Moreover, today, 83% of the FBI's 13,500 special agents are white.[35]

A senior FBI official called the longstanding failure to diversify its ranks as nothing short of "a huge operational risk," according to an article in *Pro Publica*, describing it as "something that compromises the agency's ability to understand communities at risk, penetrate criminal enterprises, and identify emerging national security threats."[36]

In that same article, FBI spokesperson, Lauren Hagee stated that increased diversity in the "is a goal we are actively working to achieve. We know we are best able to protect the nation when we look like and represent the communities we serve. We know diversity increases cultural competence. We also know that once we understand and leverage the full diversity of our workforce, our operations and investigative and analytical insight are more effective."[37] Then-FBI Director Comey echoed this sentiment in a speech in 2016:

---

[32] Devlin Barrett, *FBI Director Comey Calls Agency's Lack of Diversity a 'Crisis,'* WALL STREET JOURNAL, July 13, 2016, available at https://www.wsj.com/articles/fbi-director-comey-calls-agencys-lack-of-diversity-a-crisis-1468426138.
[33] Topher Sanders, *The FBI — 'Fidelity, Bravery, Integrity' — Still Working on Diversity,* PRO PUBLICA, March 16, 2018, available at https://www.propublica.org/article/the-fbi-fidelity-bravery-integrity-still-working-on-diversity ("*Still Working on Diversity*").
[34] *Id.*
[35] Alice Speri, *The FBI's Race Problems Are Getting Worse*, The Intercept, April 21, 2008, available at https://theintercept.com/2018/04/21/terry-albury-fbi-race-whistleblowing/ ("*The FBI's Race Problems*").
[36] *See Still Working on Diversity, su*pra.
[37] *Id.*

> Becoming a more diverse FBI is of course the right thing to do, but it's also about being more effective in carrying out our responsibilities and our mission in this wonderful country of ours. We are more credible and we make better decisions when we bring different perspectives to bear. We know more, we see more, we are better. So we need to be more diverse in race, in religion, in ethnicity and background.[38]

Notably, as mentioned above, the current Minneapolis FBI office has made it a priority to boost its minority recruitment efforts. One of the four assistant special agents in charge in Minneapolis explained "We protect the American people so we need to look like the American people."[39] As such, the office has expanded outreach to groups like the Minnesota Urban League and the Black Lawyers Association and is also making a push to recruit more American Indian candidates.[40] In the Minneapolis Field Office, the diversity figures for the entire office (not just Special Agents), provided by the government in response to a defense request, are as follows for 2014-2017:

- 2014 – 5.8% minority;
- 2015 – 5.7% minority;
- 2016 – 6.3% minority;
- 2017 – 6.8% minority.

The lack of diversity within the Minneapolis FBI office paralleled the conflicts Mr. Albury experienced during his time as a Special Agent in the Minneapolis FBI field office, both within his professional environment, but more importantly, in the context of the FBI's work in and relationship with the populations it was policing.

At the time, among other matters, the squad was focused on investigations related to support for al-Shabab, an Islamic militia group seeking to topple Somalia's weak transitional

[38] Available at http://josephsonsexemplarypolicing.org/2016/08/law-enforcement-and-the-communities-we-serve/.
[39] Stephen Montemayor, *FBI, Known for Men in Suits, Aims for Greater Diversity*, STAR TRIBUNE, June 15, 2017, available at http://www.startribune.com/fbi-known-for-men-in-suits-aims-for-greater-diversity/428072033/.
[40] *Id.; see also* Stephen Montemayor, *FBIs' Minneapolis Office to Make Diversity Recruitment Push this Summer*, STAR TRIBUNE, June 15, 2018, available at http://www.startribune.com/fbi-s-minneapolis-office-to-make-diversity-recruitment-push-this-summer/485694322/.

government. This support came in the form of financial contributions and the recruitment of young Twin Cities men -- usually of Somali descent -- to travel to Africa and join al-Shabab.

As recounted in Dr. Sachs's Report, and also in the PSR, Mr. Albury could not reconcile the cultural attitudes implicit -- and indeed explicit -- in the FBI directives he was required to implement towards Africans and African-Americans, in particular towards those of Somali descent, with his duties at work and his role as equal protector of all.[41]

Mr. Albury often observed or experienced racism and discrimination within the Bureau, but the most difficult aspect of his employment in Minneapolis for Mr. Albury was his obligation to implement FBI directives to survey individuals suspected of being terrorism threats, and to recruit and supervise individuals known as confidential human sources (CHS's), who could inform on potential security threats and intelligence gaps.

The process generated profound distrust between law enforcement representatives and the Somali community in Minnesota. As the Brennan Center for Justice (at New York University Law School) concluded in a 2015 report, while "outreach efforts focused on the local Somali community have been touted as a national model," documents obtained by the Brennan Center indicated that "outreach quietly morphed into a source of intelligence for federal agencies, similar to other controversial efforts in California and New York."[42]

As an African-American of East African descent, and as the only black field agent in the office for most of his time in Minneapolis, Mr. Albury keenly felt these criticisms. In his closing summaries, as he did in San Jose, Mr. Albury would express his concerns that the cases

---

[41] Sachs Report at 10-11; PSR at ¶¶ 49, 50.

[42] Michael Price, "*Community Outreach or Intelligence Gathering? A Closer Look at "Countering Violent Extremism Programs*," Brennan Center for Justice, January 29, 2015, at 1, available at https://www.brennancenter.org/sites/default/files/analysis/Community_Outreach_or_Intelligence_Gathering.pdf; *see also* https://www.theguardian.com/us-news/2015/sep/14/somali-muslims-minnesota-counter-extremism-program (describing the opposition and distrust of the Somali community in Minnesota towards a Countering Violence Extremism program instituted in 2014 due to previous FBI efforts to use community outreach as a front for intelligence gathering).

were based on weak evidence, and harming the relationship between the FBI and the community. As in San Jose, however, Mr. Albury was told that the predication of cases was not his concern. He continued to feel deeply conflicted by his involvement in raids and interrogations that he increasingly saw as unjustified and ineffective. He also felt increasingly isolated as he did not view any of his colleagues as people with whom he could share his concerns.

Mr. Albury's isolation and alienation was compounded by his observations and experiences of racism, including racial jokes and slurs and verbal hazing, directed both at himself and at minority communities in Minneapolis, in particular the Somali community.

Despite his inner conflicts, Mr. Albury was an exemplary agent, garnering several awards during his years in Minneapolis:[43]

- August 1, 2014: FBI award from Director James Comey for outstanding efforts in the handling of a difficult terrorism financing investigation.
- April 28, 2015: FBI award from Director James Comey for exceptional efforts in the recruitment of two Confidential Human Sources.
- July 21, 2015: FBI award from Director James Comey in recognition of performance as a Field Training Agent for a minimum of six months and exceeding your responsibilities of mentoring and coaching New Agents, while maintaining a normal workload.
- June 20, 2016: FBI award from Director James Comey for an outstanding investigation involving two individuals who were possible members of a [redacted] sleeper cell.

[43] *See* Annexed awards at Exhibit B.

- July 7, 2016: FBI award from Director James Comey in recognition of performance as a Field Training Agent for a minimum of six months and exceeding your responsibilities of mentoring and coaching New Agents, while maintaining a normal workload.

Mr. Albury channeled his conflict into drafting a "White Paper" that would present a complementary, and in Mr. Albury's view, more effective approach to terrorism enforcement than CHS recruitment.

8. Mr. Albury's White Paper

Building on an idea he had from his days in Iraq, in late 2015 Mr. Albury began researching and drafting a "white paper" laying out his views on a terrorism enforcement approach based on a community policing model. *See* Exhibit C. In essence and as a complement to existing strategies, the paper advocated a "cop on the beat" approach to engagement with the Muslim community and the development of human sources.

As Mr. Albury explained, "the ultimate goal of this initiative is to engender trust, mutual respect, and build sustainable long-term relationships with a cross section of the Minneapolis-St. Paul Islamic community." *Id.* Mr. Albury's White Paper drew inspiration from initiatives in U.S. cities and across the world, including the "One City: Safe and Fair - Everywhere" program in New York City, the Muslim Liaison Officer at the Los Angeles Sheriffs Department and the Islamic Liaison Team formed by the Australian Federal Police. As he elaborated in his White Paper:

> From the vantage point of local law enforcement, the beat cop's success lies in his/her ability to truly develop close ties and meaningful relationships with citizens on his/her beat. Ideally, the public should view that officer as their conduit of support on everything from an abandoned car in a parking lot, teenagers blasting loud music in a residential neighborhood, or a suspicious

> person camped out in front of a neighborhood school. Ultimately, the officer's sole focus should be on truly getting to know the men, women, and children who work, live, and play in the areas they serve.
>
> The beat cop's perspective in law enforcement not only holds true for generalized policing in cities and urban centers, but also for direct engagement with insular immigrant communities who traditionally view an agent or officer with suspicion.

*See* Exhibit C.

Acknowledging that "there is no panacea to stem the flow of men, women, and youth to the ranks of ISIL and other terrorists groups around the globe," Mr. Albury concluded that the FBI can nonetheless achieve a level of success in its counter-terrorism work by "building meaningful ties and relationships in the Muslim community," partnerships that can "form information pipelines-conduits through which our law enforcement agencies can learn about real, concrete terrorist plots." *Id.* (*quoting* law professor David Harris).

Mr. Albury shared his White Paper with a fellow agent (not in Minnesota), who encouraged him to share it with FBI management. After much deliberation, in light of the sentiments he had witnessed among his colleagues and supervisors both locally and nationally, Mr. Albury rejected that suggestion and decided instead to delete the document. He concluded that his proposal would simply fall on deaf ears.

8. Research and Reports Corroborating Mr. Albury's Experiences

Mr. Albury's perception of the atmosphere within the FBI – in terms of both its discriminatory investigative approach and the insuperable obstacles to internal challenge – is confirmed by objective and historical evidence. For example, the American Civil Liberties Union's list of the "10 Most Disturbing Things About the FBI Since 9/11,"[44] includes the 2008

[44] Available at https://www.aclu.org/issues/national-security/privacy-and-surveillance/ten-most-disturbing-things-you-should-know-about.

Attorney General's Guidelines authorizing "domain management assessments" which allow the FBI to map American communities by race and ethnicity based on crass stereotypes about the crimes they are likely to commit; the FBI's "War on Whistleblowers," almost invariably targeting critics of government policies;[45] the FBI's targeting of journalists by getting phone records, search warrants and "exigent letters;" and the FBI's use of its expanded authorities to target individuals and organizations because of their participation in First Amendment-protected activities, including exploitation of community outreach programs to secretly collect information about law-abiding citizens, such as mosque attendees.

Earlier this year, *Foreign Policy* reported on a draft Department of Homeland Security ("DHS") proposal that called on authorities to continuously vet Sunni Muslim immigrants deemed to have "at-risk" demographic profiles."[46] In addition, during the time frame encompassing the offense conduct in this case, the federal government floated the prospect of amending its counter-extremism program to concentrate exclusively on Muslim extremism, thereby removing white supremacy as a target of the program.[47] More recently, *The Boston Globe* revealed the existence of a program, "Quiet Skies," that involves physical surveillance of airline passengers, and which has generated opposition from within the law enforcement community tasked with its implementation.[48] As *The Globe* reported, "[f]ederal air marshals have begun following ordinary US citizens not suspected of a crime or on any terrorist watch

---

[45] *See also* U.S. Department of Justice, Office of the Inspector General, *Evaluation and Inspections Division, "Review of the Federal Bureau of Investigation's Disciplinary System*," May 2009, available at https://oig.justice.gov/reports/FBI/e0902/final.pdf.

[46] George Joseph, "*Draft DHS Report Called for Long-Term Surveillance of Sunni Muslim Immigrants*," *Foreign Policy*, February 5, 2018, available at http://foreignpolicy.com/2018/02/05/draft-dhs-report-surveillance-of-muslim-immigrants/.

[47] *See* Julia Edwards Ainsley, Dustin Volz, Kristina Cooke, "*Exclusive: Trump to focus counter-extremism program solely on Islam – sources*," *Reuters*, February 1, 2017, available at https://www.reuters.com/article/us-usa-trump-extremists-program-exclusiv/exclusive-trump-to-focus-counter-extremism-program-solely-on-islam-sources-idUSKBN15G5VO (according to source, "[t]he Trump administration wants to revamp and rename a U.S. government program designed to counter all violent ideologies so that it focuses solely on Islamist extremism").

[48] *See* Jana Winter, "*Welcome to the Quiet Skies*," The Boston Globe, July 28, 2018, available at https://apps.bostonglobe.com/news/nation/graphics/2018/07/tsa-quiet-skies/.

list and collecting extensive information about their movements and behavior under a new domestic surveillance program that is drawing criticism from within the agency."[49]

In the context of counterterrorism, FBI's lack of internal diversity and tolerance generates additional problems. According to Michael German, a former FBI Agent who now is a Fellow at Brennan Center for Justice's Liberty and National Security Program (at New York University School of Law), "'[i]t has actually gotten worse every year since 9/11, and I don't think that's an accident[.]"[50] Mr. German asserts that the "[t]he FBI has given a lot of lip service, yet it hasn't responded in a way that would actually change things," attributing a portion of that attitude to "this national security imperative that tends to view even people within the FBI with suspicion, particularly if they stand out."[51]

Mr. German explains that "[n]ational security policies that the public should know about demonstrate racial and ethnic bias that make it hard for people to work there who are not conformists," adding that "[t]he problem is that the FBI is a very conformist organization[,]" and "anybody who publicly criticizes the FBI is ostracized from the wider FBI fraternity – and I say fraternity because it is still almost all male, as well as almost all white."[52]

In addition, Mr. Albury's lack of confidence in internal channels within the FBI as a means of effecting change is consistent with the discouraging history of "whistleblowing" within the FBI. As Michael German, former FBI agent and whistleblower, explains, "[t]here is no safe way for an FBI whistleblower to internally report a complaint without opening yourself up to retaliation[,]" because "[t]he internal system the Justice Department uses to adjudicate

---

[49] *Id.*
[50] *FBI's Race Problems, supra.*
[51] *Id.*
[52] *Id.*

whistleblower reprisal cases is a complete failure."[53] As a threshold matter, FBI employees are not afforded the same statutory protections granted other federal whistleblowers.[54] Instead the Attorney General was directed "to develop regulations to ensure that FBI employees are not retaliated against for disclosures of wrongdoing."[55]

FBI's official policy recognizes the importance of whistleblowers. Yet, for years the FBI has been criticized by government accountability agencies for its failure to protect whistleblowers, and/or provide appropriate mechanisms for processing and evaluating whistleblower claims, as well as claims of retaliation for whistleblowing.[56]

Moreover, whistleblowers encounter problems throughout the U.S. intelligence community. Earlier this year, the Daily Beast reported that "[t]he nation's top intelligence watchdog put the brakes on a report last year that uncovered whistleblower reprisal issues within America's spy agencies[.] . . . The move concealed a finding that the agencies – including the CIA and the NSA – were failing to protect intelligence workers who report waste, fraud, abuse, or criminality up the chain of command."[57] In addition, when a

---

[53] *The FBI's Race Problems, supra*.
[54] "*Whistleblower Protection: Additional Actions Needed to Improve DOJ's Handling of FBI Retaliation Complaints*," United States Government Accountability Office, January 2015 at 5-6, available at https://www.gao.gov/assets/670/668055.pdf ("GAO 2015 Report).
[55] *Id*. at 15; *see also* Michael E. Horowitz, Inspector General, United States Department of Justice, Statement before the Senate Committee on the Judiciary, "*Whistleblower Retaliation at the FBI: Improving Protections and Oversight*," March 4, 2015 (hereinafter "*Horowitz Testimony*"), available at https://oig.justice.gov/testimony/t150304.pdf.
[56] *See*, *e.g.*, Office of the Inspector General, U.S. Department of Justice, "*Procedural Reform Recommendation for the Federal Bureau of Investigation*," Oversight and Review Division 18-01, March 2018, at -----, available at https://www.oversight.gov/sites/default/files/oig-reports/o1801.pdf (finding that supervisory employees in several FBI offices failed to understand that allegations of wrongdoing by a subordinate employee were potential "protected disclosures" under whistleblower law, and failing to respond appropriately to these protected disclosures because the supervisory employees took personnel actions against the employee for failing to follow the "chain of command" when the employee communicated directly with a high-level supervisor); GAO 2015 Report, *supra* (describing the procedural barriers erected by FBI to enable it to reject a large majority of complaints, and to let retaliation against whistleblowers continue unpunished); Horowitz Testimony, *supra*.
[57] Kevin Poulsen, "*U.S. Intelligence Shuts Down Damning Report on Whistleblower Retaliation*," *The Daily Beast*, February 2, 2018, available at https://www.thedailybeast.com/us-intelligence-shut-downs-damning-report-on-whistleblower-retaliation ("Over and over and over again, intelligence inspectors ruled that the agency was in the right, and the whistleblowers were almost always wrong."); *see also* Jenna McLaughlin, "NSA watchdog

whistleblower does not place him or herself at the mercy of the FBI's "broken" system, officials dispense with the pretense of tolerance. James Comey, in recounting in a memorandum a meeting with President Trump, wrote "I said I was eager to find leakers and would like to nail one to the door as a message, . . . I said something about the value of putting a head on a pike as a message."[58]

In its response to the PSR, the government provided information that established that Mr. Albury was well aware of the futility of formal internal FBI channels. As the government wrote with respect to amending ¶ 30 (p. 15-16):

> [p]rior to accessing the above-described documents in February and May of 2016, ALBURY exchanged a series of communications with a coworker on December 21, 2015. During this series of communications with a coworker on December 21, 2015. During this series of communications, ALBURY and the coworkers discussed reporting an inappropriate e-mail sent by another coworker. During their discussion, ALBURY sent a message stating, "if [the Office of Professional Responsibility] does not respond, let me go on the record and say i will contact the press." While the coworker's e-mail is unrelated to the authorized disclosure of classified documents to the News Outlet, the exchange of these messages shows that ALBURY had considered disclosing internal FBI information to the media

Thus, clearly, Mr. Albury was sensitive not only to inappropriate aspects of FBI culture, but also to the ineffectiveness of "reporting upward" through "proper channels." It is also clear that his message was simply an idle threat designed to spur OPR to action – an experience that further convinced Mr. Albury that reporting through internal channels was ineffectual. As a result, with regard to the materials he disclosed, he literally took matters into his own hands.

---

details privacy concerns and moves to protect whistleblowers," *CNN*, July 26, 2018, available at https://www.cnn.com/2018/07/26/politics/nsa-intelligence-watchdog-privacy/index.html ("new report aims to address past issues with whistleblower protection, both within the NSA and in the broader contractor community").

[58] *FBI's Race Problems, supra.*

D. Marriage and Family

Mr. Albury married his wife [ *** ] following a two-year courtship. Mrs. Albury is the child of Cambodian refugees, who were sponsored by a U.S. church during the Cambodia genocide. The couple have two children together: [***] born in 2010 and [***] born in 2014. Mrs. Albury was herself about to pursue a career in law enforcement, but elected instead to put her career on hold to raise their family.

Their marriage is strong and loving, and Mrs. Albury describes her husband as "a nurturing and hands-on father," who "always emphasized the importance of working hard and pursuing education . . . and taught their daughter to read and write."[59] This prosecution has taken a deep emotional toll on the family, as recounted in the PSR and letters submitted to the Court.[60]

[59] PSR ¶ 53.
[60] PSR ¶ 55; Exhibit D.



*Mr. Albury Pictured with his Wife and Two Children (2017)*

Mrs. Albury also corroborates Mr. Albury's experiences of isolation and alienation in connection with his professional experiences in Minnesota, recounting his frequent sadness over incidents at work and one occasion when he broke down.[61] As she explains:

> It became a human rights thing for him, the mistreatment and tactics that were used by FBI and how he was a part of it. He was conflicted by it and didn't have anyone he felt he could reach out to with this problem. It just really pained him…he really isolated

[61] PSR ¶ 54.

> his feelings, and that's why things came out the way it did…I didn't know how deeply it had affected him, the depths of his despair, I didn't know how to help him. I carry that guilt with me, as a partner, a person who is supposed to help carry him through life when you're going through difficult time . . .
>
> Putting it all together, I see how all the pain in his life has brought him to this point. At first, it was very confusing. I didn't know the depth and magnitude of what he was going through…There are so many layers to this…Now I understand it better, and I'll be here to support him and do what I can.[62]

E. Dr. Sachs's Psychological Evaluation of Mr. Albury

Despite the tremendous pressures and stresses of his work, Mr. Albury never sought mental health treatment and counseling throughout his 16-year career with the FBI. He was concerned that any psychiatric or psychological assistance would adversely impact his regular background employment checks.

For the same reason -- perhaps even more forcefully -- he never availed of the FBI Employee Assistance Program, which was viewed internally as a program administered "in-house" by fellow FBI colleagues. Notably, although employment as an FBI agent, particularly in the terrorism context, is among the most stressful occupations, routine psychological assessment and counseling is not a job requirement.

It was not until the execution of the search warrant in this case August 29, 2017 that Mr. Albury first saw a clinical psychologist, Dr. William Allen,[63] for therapy to address "the conflict he felt as a dedicated law enforcement agent who nonetheless witnessed (and often personally experienced) injustices within his agency and its dealings with the public

[62] *Id.*; *See also* Ben Taub, "*The Spy Who Came Home*," *The New Yorker*, May 7, 2018, at 4, available at https://www.newyorker.com/magazine/2018/05/07/the-spy-who-came-home (the account of a former CIA operative who returned to the U.S. to be a "beat cop" because "over the years he came to believe that counterterrorism was creating more problems than it solved, fuelling illiberalism and hysteria, destroying communities overseas, and diverting attention and resources from essential problems in the United States").
[63] http://www.bmhr.info/william-allen/.

(particularly communities of color)" and the "deep distress these conflicts caused given his life's dedication to the equal application of justice and law enforcement for all citizens of the United States."[64] Mr. Albury has found the process cathartic and illuminating, and, throughout, has acknowledged "his reliance on his spirituality and his connection with his family as sources of strength."[65] Dr. Allen notes in his report to the Probation Department that Mr. Albury was open, frank, reflective and experienced the full range of emotions.[66] Mr. Albury has continued this treatment in California with a psychologist recommended by Dr. Allen.

In addition, as set forth in the report (annexed as Exhibit A) in connection with this sentencing, Mr. Albury has been evaluated by Dr. Emily Sachs, a clinical psychologist who worked as a therapist, researcher and clinical evaluator at the Bellevue/NYU Program for Survivors of Torture (2003-2010), a staff psychologist at the San Francisco VA Medical Center (2012-2015), and a trainer of psychology doctoral students to assess veterans for Posttraumatic Stress Disorder and related disorders.

Dr. Sachs' provided a psychosocial history of Mr. Albury and a summary of his psychological functioning, addressing any factors that may have influenced his decisions and actions in relation to the instant offense. In particular, Dr. Sachs analyzed whether Mr. Albury suffered from a Depressive Disorder, Post Traumatic Stress Disorder, Other Specific Trauma- and Stressor-Related Disorder, and the psychological construct, "moral injury."

As Dr. Sachs explains, the term moral injury was generated through clinical and research observations with U. S veterans and is currently used by the National Center for

[64] PSR ¶ 59.
[65] *Id.*
[66] *Id.*

PTSD to describe and plan treatment for veterans with the following experiences, not captured by the PTSD diagnosis:

> Moral injury is a construct that describes extreme and unprecedented life experience including the harmful aftermath of exposure to such events. Events are considered morally injurious if they "transgress deeply held moral beliefs and expectations." Thus, the key precondition for moral injury is an act of transgression, which shatters moral and ethical expectations that are rooted in religious or spiritual beliefs, or culture-based, organizational, and group-based rules about fairness, the value of life, and so forth.[67]

As Dr. Sachs explains in her report, typical "moral injury events" include acts of self, such as unintentional errors leading to injury or loss of life, or engaging in acts that violated one's own moral code or values, or acts of others, such as transgressions of peers and leaders who betray expectations in egregious ways.[68] These "moral injury events" can lead to intense feelings of shame, guilt, withdrawal, self-condemnation, isolation, alienation and anger.[69] Dr. Sachs adds that Posttraumatic Stress Disorder and other trauma- and stressor- related disorders are highly correlated with depression, but carry distinct symptoms.[70]

How do law enforcement professionals navigate these kinds of conflicts? Dr. Sachs explains that:

> It is well-established that verbally processing experiences with someone who can provide understanding and support is essential for mitigating work-related stress and preventing burnout and post-traumatic stress disorders.[71] This is particularly true in law enforcement work with high levels of stress and secrecy. In response to unacceptable levels of work-stress-related FBI agent suicides, premature retirement and resignation, disciplinary

[67] Sachs Report at 9 (*quoting* Maguen S, Litz B. *Moral injury in the context of war*. National Center for PTSD website. https://www.ptsd.va.gov/professional/co-occurring/moral_injury_at_war.asp. Updated February 23, 2016. Accessed September 20, 2018).
[68] *Id.*
[69] *Id.*
[70] *Id.*

> problems, alcohol abuse and absenteeism, FBI psychological experts and supervisors have focused recommendations on reducing agent isolation and increasing opportunities to discuss stressors and receive support. While recommendations for *preventive* stress management focus training the agents to recognize, understand and cope individually with regular stressors of the job, agency authors recognize that agents who have been significantly impacted by traumatic or cumulative stress need collegial/social outlets of discussion and support, as well as professional attention to their mental health. Thus, they recommend having no less than four options for restoring stress-impacted employees to full level of functioning: EAP, chaplaincy, a critical incident response program, and peer support. **The benefits of processing conflicts and distressing incidents with colleagues is highlighted: "No other person can offer better support to the survivor of a critical incident than another individual who has encountered and successfully coped with [a similar] event**."[72]

Dr. Sachs acknowledges, however, that there are still significant barriers for FBI and the law enforcement personnel to access social and psychological support services:

> Experts describe law enforcement "subculture" in terms of strong pressure to conform, e.g., "The foremost requirement is loyalty; an officer never 'rats' on another officer, and the code of secrecy remains very influential." Additional reasons law enforcement agents rarely reach out for help for debilitating job-related stress include fear of being seen as troubled, ineffective, unable to undertake normal work responsibilities, unworthy of promotion, and unable to carry firearms; and mistrust with respect to confidentiality. Instead, culturally-sanctioned means of coping with stress and trauma from the job include alcohol use, emotional detachment, and other forms of avoidance. In a vicious cycle, these methods are associated with exacerbation of posttraumatic stress symptomology (Violanti, 1992).[73]

In the case of someone like Mr. Albury, their minority status can further isolate them and exacerbate their sense of isolation:

> Most research on "tokens" (i.e., persons who comprise less that 15% of a group's total) in professional settings has demonstrated

---

[72] *Id.* at 10-11 (*quoting* Sheehan SS. *Stress management in the Federal Bureau of Investigation: principles for program development*. International journal of emergency mental health. 1999;1(1):39-42.) (emphasis added).
[73] *Id.* at 11-12.

> that tokens feel more stress, isolation and barriers to career mobility. For African-American workers in elite jobs, there is research evidence that seeking out a colleague who will listen is a beneficial strategy for handling work stress, where as "forbearance" (e.g., hiding one's feelings) and avoidance are related to poor mental health.[74]

Dr. Sachs's conclusions based on Mr. Albury's family and cultural history and his professional experiences in the FBI, coupled with the roles he was required to perform as an FBI agent, are summarized as follows:

REDACTED

[74] *Id.* at 12, citing Braboy Jackson P, Saunders T. Work stress, coping resources, and mental health: A study of America's black elite. Employee health, coping and methodologies 2006 Mar 27 (pp. 139-169). Emerald Group Publishing Limited.

REDACTED

F. <u>The Offense</u>

In 2016, Mr. Albury began downloading, removing and/or copying sensitive, confidential and classified information related to the FBI's policies regarding efforts to counter violent extremism domestically, and in particular, documents related to methods and strategies to recruit potential CHS's and to identify potential extremists -- strategies that have been interpreted as profiling and intimidating minority communities.

At the time, he knew then, and fully acknowledges now, that his conduct was illegal. As an FBI agent, he maintained a TOP SECRET/Sensitive Compartmented Information security clearance and had access to national defense and classified information. He received training on -- and at all times was fully aware -- what it meant to have such clearance and the consequences of violating these procedures.

He turned those documents over to a journalist at a U.S. media organization who posted them online in several articles, including a document pertaining to assessing Confidential Human Sources dated August 17, 2011, and an undated document relating to threats posed by certain individuals from a particular Middle Eastern country, as set forth in the Information filed in this case on April 17, 2018.

In early 2017, Mr. Albury was assigned by the FBI as an airport liaison working counterterrorism and other matters with Customs and Border Protection at the Minneapolis/St. Paul International Airport. In that role, he continued to copy confidential, sensitive and classified material related to U.S. counter-terrorism efforts to the extent they impacted domestic counter-terrorism policy - primarily by photographing the documents while displayed on his computer screen at work. In particular, given that new assignment, his focus was U.S. policy to identify and interdict potential national security threats and recruit potential CHSs at the border. Those documents included a document related to the use of an online platform for recruitment by a terrorist group.

Mr. Albury did not provide the documents he downloaded at the airport to anyone, although he did recover and retain them in a manner to erase data that could identify him (*i.e.* using a camera to photograph them and collating into documents through pdf software). In addition, Mr. Albury had obtained an email account through a service that encrypts end to end transmissions. He loaded the documents on a storage device, around which he had wrapped the number of the journalist to whom he had disclosed documents previously. He hid the device in a secret location at his home known only to himself.

G. Acceptance of Responsibility

Mr Albury took full responsibility for his actions. In his statement of responsibility, submitted to the Probation Department, he stated:

> I take full responsibility for my actions. I fully accept that my actions were illegal.
>
> I apologize to everyone I have hurt as a result of my actions, especially, my family, my co-workers in California and Minneapolis, and my colleagues in the law enforcement community.

> At no point did I ever intend to put anyone in personal danger for my actions. Nor did I intend personal gain from my actions – I did not seek nor obtain any money or other remuneration or advantage in return. In fact, the actions ended my career at the FBI.[81]

## ANALYSIS OF § 3553 FACTORS

### A. Applicable Sentencing Standard

As the Supreme Court reaffirmed in *Pepper v. United States*, the cornerstone of federal sentencing is that the sentencing judge "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.*, 562 U.S. 476, 487 (2010) (*quoting Koon v. United States*, 518 U.S. 81, 113 (1996)).

That process is embodied in the advisory sentencing system instituted by the Supreme Court's decision in *United States v. Booker*, 125 U.S. 738 (2005), which changed the "sentencing landscape . . . substantially" to "emphasiz[e] a sentencing court's broad discretion in crafting an individualized sentence." *United States v. Forde*, 664 F.3d 1219, 1223 (8th Cir. 2012); *see also United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (*en banc*) ("the district court is prohibited from presuming that the Guidelines range is reasonable" and instead "must 'make an individualized assessment based on the facts presented'") (*quoting Gall v. United States*, 552 U.S. 38, 50 (2007)). The deference granted a district court's determination springs from its "special competence of sentencing courts" to make "defendant-specific determinations." *Feemster*, 572 F.3d at 464 (*quoting United States v. Gardellini*, 545 F.3d 1089, 1090 (D.C. Cir. 2008)).

---

[81] PSR ¶ 18.

Consistent with the principle of individualized sentencing is the wide discretion afforded the sentencing judge "in the sources and types of evidence used to assist [.] in determining the kind and extent of punishment to be imposed," in particular, "the fullest information possible concerning the defendant's life and characteristics." *Pepper*, 562 S.Ct. at 488 ("[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant") (citations omitted). Indeed, as the Court in *Pepper* points out, this principle is codified in 18 U.S.C. § 3661 ("[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence"). *Id*; *see also United States v. Jordan*, 573 F.3d 586, 590 (8th Cir.2009) (district court must "specifically address[.] the defendant's proffered information in its consideration of the 18 U.S.C. § 3553(a) sentencing factors").

The Guidelines provide "the starting point and the initial benchmark" for the district court, but they do not usurp the district court judge's "superior position to find facts and judge their import under § 3553(a)." *Gall,* 552 U.S. at 51. Under § 3553(a), "[t]he court shall impose a sentence sufficient, but not greater than necessary" to fulfill the purposes of sentencing. 18 U.S.C. § 3553(a).

Below, we first address the applicable guideline, and then explain how "an individualized assessment" of the § 3553(a) factors in Mr. Albury's case strongly supports a non-custodial offense here.

B. The Applicable Guideline

The presentence report calculates Mr. Albury's applicable guideline as a level 23 and a guideline range of 46 to 57 months (a base offense level of 24, pursuant to §2M3.3, plus 2 levels for abuse of trust, pursuant to §3B1.3, and minus 3 levels for acceptance of responsibility, pursuant to §3E1.1(a)). We respectfully submit that the abuse of trust enhancement does not apply here as it is already incorporated into the underlying guideline itself as applied to the circumstances of Mr. Albury's case. Alternatively, we submit that §2M3.3 does not reflect the Commission's traditional empirical analysis of 18 U.S.C. §793(e) prosecutions involving government whistleblowers.

1. The Abuse of Trust Enhancement Is Inapplicable In This Case

The 2-level enhancement for abuse of trust imposed in the PSR pursuant to U.S.S.G. § 3B1.3 is not applicable here. As noted in the PSR, this enhancement does not apply "if the abuse of trust is already included in the base offense level or specific offense characteristics." U.S.S.G. § 3B1.3; *see also United States v. Waldner*, 580 F.3d 699, 707 (8th Cir. 2009). ("[S]entencing courts err when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways.") (*quoting United States v. Smith*, 516 F.3d 473, 476 (6th Cir.2008)); *United States v. Claymore*, 978 F.2d 421, 423 (8th Cir. 1992) ("If an abuse of trust is so central to the crime that the abuse would be included in the base offense level, the increase under § 3B1.1 is not available.").

As the Eighth Circuit elaborated in *Claymore*, the additional two points for abuse of trust should be added only "if the defendant's position is one of a specialized nature *not merely giving him access to commit the crime*." *Id.* (emphasis added) (finding police officer had

abused his trust where he had used position and police vehicle to sexually assault a victim; his "position of trust involved more than simple access to the victim").

In this case, the factors underlying the finding of an abuse of trust are by their very nature necessarily incorporated in the two offenses of conviction. First, as the PSR notes, "[*o]f primary consideration*, Mr. Albury had a security clearance which allowed him to *access* classified information in the course of his daily work. This significantly facilitated the offense, as the information could not be disclosed unless it could first be accessed." PSR ¶ 25 (emphasis added); *see also id.* ("[the abuse of trust] adjustment reflects *how the information was accessed and obtained*") (emphasis added). The security clearance, which is granted to all FBI special agents, is what afforded Mr. Albury *access* to commit the offenses -- precisely the characteristic deemed *in*sufficient to transform a *de facto* position of trust into the foundation of an abuse of trust enhancement. *See Waldner*, 580 F.3d at 707; *Claymore*, 978 F.2d at 423.

In addition, the factual basis of Mr. Albury's convictions makes clear just how integral and indispensable his position of trust as an FBI agent (and thereby trusted holder of a security clearance) was to his criminal liability. An essential element of both counts of conviction is that Mr. Albury willfully engaged in "unauthorized" handling of national defense documents, either through transmission or retention.

As Mr. Albury's factual allocution acknowledged, it was only his security clearance that granted him access to sensitive and classified material. Plea Agreement, ¶ 2(e). What made Mr. Albury's actions "unauthorized" was his misuse of the trust placed in him by virtue of the security clearance. Here, that was his handling of National Defense Information in a manner contrary to the training and instructions he received – and the concurrent obligations he

assumed – with respect to "the proper handling, marking, transportation, and storage of classified materials." Plea Agreement, ¶ 2(d).

As the plea agreement elaborates:

> The defendant received training on his duty to protect classified materials from unauthorized disclosure, which included complying with handling, transportation, and storage requirements. The defendant knew that unauthorized removal of classified materials and transportation and storage of those materials in unauthorized locations risked disclosure and transmission of those materials, and therefore could endanger the national security of the United States and the safety of its citizens. In particular, the defendant had been advised that unauthorized disclosure of SECRET information reasonably could be expected to cause serious damage to the national security of the United States, and that violation of rules governing the handling of classified information could result in criminal prosecution.

*Id.*

It was also a critical element of Mr. Albury's offenses of conviction that his conduct was knowing and willful. Similarly, as the factual allocution makes clear, it is the abuse of his position of trust as an FBI agent – his handling of documents contrary to the training he received about his security clearance – which forms the basis of the *mens rea* element of his convictions. *See* Plea Agreement, ¶ 2(l) ("the defendant knew that he was not authorized to remove documents containing National Defense Information and classified information from secure locations, and further knew that he was not authorized to retain them at his residence, and knew that he was not authorized to transmit them to any person not authorized to receive them").

The above analysis demonstrates that punishing Mr. Albury by adding a two-point enhancement for abuse of trust, when the abuse of trust is essential to all aspects of his offense, would penalize him twice for the same conduct. *See Waldner*, 580 F.3d at 707 (error if

"precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways").

The Probation Department maintains, nonetheless, that §2M3.3 could apply to individuals not authorized to receive classified information and, accordingly, the cumulative application of a two-level enhancement for abuse of trust in Mr. Albury's case does not constitute double-counting. This analysis, however, improperly adopts a categorical approach to the application of guideline application, rather than a case-specific application based on the facts and circumstances of an individual case.

Enhancements are fact- and case-specific. That an abstract version of an offense might encompass an enhancement does not control *this case*. Here, regardless of hypothetical possibilities, Mr. Albury's offense conduct necessarily included an abuse of trust as an indispensable part of the offense. Indeed, the Eighth Circuit in *Waldner* and *Claymore* emphasizes the individual specificity required in analyzing whether an enhancement under § 3B1.3 should apply. *See Waldner*, 580 F.3d at 707 (focusing on whether "the same aspect of *a defendant's conduct* factors into his sentence in two separate ways"); *Claymore*, 978 F.2d at 423 (focusing on the "specialized nature" of the "*defendant's position*") (emphasis added).

The "heartland" of § 793(e) prosecutions consists of individuals occupying governmental positions of trust. In that context, the Sentencing Commissions sets its base offense levels to reflect the "heartland" cases of a particular offense. U.S.S.G., Ch. 1, pt. A § 4(b) ("The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes."). While we argue further below that this case falls outside the heartland of typical espionage cases because Mr. Albury is a whistleblower, at least for purposes of determining whether an

abuse of trust enhancement applies, Mr. Albury's government status is equivalent to the employment status of the heartland defendants for this guideline.

As a result, it is respectfully submitted that the base offense level for this offense already incorporates the "abuse of trust" concept, and adding an adjustment pursuant to § 3B1.3 would constitute double-counting. *Cf. United States v. Parker*, 762 F.3d 801, 806 (8th Cir. 2014) (rule of lenity requires that if an ambiguous section of the Sentencing Guidelines may be given either of two plausible readings, the ambiguity must be resolved in the defendant's favor).

2. §2M3.3 Was Not Based on Empirical Data or Amended Based on National Experience

As the Supreme Court has made clear, 18 U.S.C. § 3553(a) must be the touchstone of every federal sentencing decision. *See Rita v. United States*, 551 U.S. 338, 351 (2007); *United States v. Booker*, 543 U.S. at 220, 268-69 (2005). In *Rita*, the Supreme Court articulated two reasons why it may be "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives." 551 U.S. at 351.

First, the original Sentencing Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." *Id.*, at 348-50.[82] Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id.* at 348-50. The Court recognized, however, that not all guidelines had been developed in this manner. *See Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 85, 96 (2007).

[82] Even those 10,000 cases were not fully representative because they did not include sentences of probation – 48% of the total of sentences imposed.

A district court may vary from the advisory guideline, and its decision to do so "may attract greatest respect when the sentencing judge finds a particular case 'outside the heartland' to which the Commission intends individual Guidelines to apply." *Kimbrough v. United States*, 552 U.S. 85, 89 (2007) (*quoting Rita*, 551 U.S. at 351 (2007)). This is especially true where the Guidelines provisions "do not exemplify the Commission's exercise of its characteristic institutional role[,]" which is "to base its determinations on empirical data and national experience." *Id.* at 109. In those circumstances, the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id.,* at 109-10.

Here, the applicable Guideline, §2M3.3(a)(2), was not initially based on empirical data of past practice, and has not been amended to account for national experience since then. As a result, the Commission has failed to fulfill its institutional role with respect to §2M3.3(a)(2), and this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. at 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

Indeed, §2M3.3(a)(2) was promulgated in an entirely different enforcement context, in which 18 U.S.C. §793 was used to prosecute espionage cases, and/or those in which a defendant disseminated classified materials without authorization for the personal benefit, monetary or otherwise, of the defendant.

U.S.S.G. §2M3.3 was included in the first version of the Guidelines and has remained unchanged since then. Accordingly, it was developed based on previous prosecutions under 18 U.S.C. § 793(d), (e) and (g). *Rita*, 551 U.S. at 349, 350. As set forth in greater depth in the briefs of *amici*, however, the Espionage Act of 1917 under which Mr. Albury is being

prosecuted was enacted during the First World War to go after spies and enemies. *See* Scholars Brief, at 2-3.

It was not until 2008 that the Department of Justice began routinely applying the Espionage Act to whistleblower cases. Indeed, before 2008, there was only one successful conviction under the Act for a disclosure to the media, and that case, *United States v. Morison*, 844 F.2d 1057 (4th Cir. 1988), involved the disclosure of classified military documents to a magazine in exchange for payment, rather than a desire, motivated by the public interest, to inform fellow citizens about government misconduct. *Id*. at 3.

Before 2008, the Espionage Act was not treated like the U.K's Official Secrets Act (which broadly criminalizes disclosure of classified government information), and, in fact, in 2000, President Clinton vetoed a bill that would have permitted felony prosecution of any person who disclosed classified information to anyone not cleared to receive it because of his obligation "to protect the rights of citizens to receive the information necessary for democracy to work." Scholars Brief at 12-13.[83] As the Reporters' Brief adds, "[i]n the 230 years since the founding of our nation, and for ninety years following passage of the 1917 Espionage Act, the prosecution of a 'leaker' as a spy was such a rarity that President Bill Clinton pardoned the first person convicted for such activity, precisely because his case was so singular." Reporters' Brief at 1-2.

The only empirical underpinning of §2M3.3 in 1987, therefore, involved cases aimed at punishing actual espionage and one case that involved a media disclosure for money, but none involving prosecutions under 18 U.S.C. 793 (d), (e) and (g) against whistleblowers who disclosed information to the press on a public interest basis. Moreover, the Commission could

---

[83] Statement by the President on Disapproving H.R. 4392, the "Intelligence Authorization Act for Fiscal Year 2001 (Nov. 4, 2000).

hardly have calibrated its Guideline to that concept since in 1987, the Espionage Act was not used routinely as a *de facto* Official Secrets Act.

That practice did not begin until two decades later. §2M3.3 therefore does not (and cannot) reflect the Commission's considered judgment of the appropriate sentence for government whistleblowers acting entirely out of a spirit of public interest. As the Reporters' Brief concludes, the Court is well within its authority to consider policy considerations such as "the abiding First Amendment considerations at play when the government seeks to prosecute an individual as a spy for speaking or providing information to the press . . . when assessing the appropriate application of the sentencing guidelines." Reporters' Brief at 9.[84]

C. Nature and Circumstances of Offense

1. Mr. Albury's Swift Acceptance of Responsibility

Mr. Albury has never disputed the charges against him, or the underlying offense conduct. After the execution of the search warrant August 29, 2017, Mr. Albury retained defense counsel and authorized them to engage the government in negotiations to resolve the matter. Once the government completed its extensive investigation – a process that lasted six months – Mr. Albury quickly reached a Plea Agreement with the government, obviating the

---

[84] Alternatively, the Court could grant a downward departure pursuant to §5K2.11, which authorizes a downward departure for "Lesser Harms," described in pertinent part as follows:

> [s]ometimes, a defendant may commit a crime in order to avoid a perceived greater harm. In such instances, a reduced sentence may be appropriate, provided that the circumstances significantly diminish society's interest in punishing the conduct, for example, in the case of a mercy killing. Where the interest in punishment or deterrence is not reduced, a reduction in sentence is not warranted. For example, providing defense secrets to a hostile power should receive no lesser punishment simply because the defendant believed that the government's policies were misdirected.

Here, Mr. Albury did not "provid[e] defense secrets to a hostile power[,]" again distinguishing his conduct from that anticipated by the Guidelines when they were created. Also, again, whether the formal departure standard has been satisfied does not in any way preclude a sentence below the Guidelines for the same reason based on the other §3553(a) factors.

need even for indictment, much less litigation and trial. His Statement of Responsibility, included in the PSR at ¶ 18, reflects his blunt and genuine acknowledgment of the illegality of his conduct.

Mr. Albury's swift resolution of the case – without discovery, without motions, and without any contest at all – manifests his contrition. In his Statement of Responsibility, Mr. Albury expresses it explicitly: "I apologize to everyone I have hurt as a result of my actions, especially, my family, my co-workers in California and Minneapolis, and my colleagues in the law enforcement community."[85]

Also, Mr. Albury's conduct since the August 29, 2017 search – well before the charges were instituted – has been impeccable. Prior to the charges, Mr. Albury, through counsel, kept the government aware of his change in residence and employment. He was circumspect as well, maintaining a public silence.

Since the charges were instituted, Mr. Albury has continued his unblemished record. He has been employed throughout and complied with all conditions of pretrial release. Again, he has avoided media and other entities interested in his case, and has instead concentrated on his family and his future.[86]

2. <u>Mr. Albury's Motive</u>

Regarding the offense conduct, it is respectfully submitted that Mr. Albury's motive is an important factor, not simply in placing his actions in perspective, but also in distinguishing them from those by other defendants in cases involving the unauthorized transmission and/or retention of classified information.

---

[85] PSR, ¶ 18.
[86] Sachs Report at 12.

As a matter of jurisprudence, a defendant's motive is highly relevant at sentencing. *United States v. Singh*, 877 F.3d 107, 2017 WL 6327823, at *9 (2d Cir. 2017) ("[a] defendant's motivation for engaging in criminal conduct is unquestionably a proper consideration at sentencing").[87] Here, Mr. Albury did not disclose the materials for money, or any personal financial gain or professional advancement. Indeed, it cost him the 17-year career he had dreamed of, and pursued, since college – including a $120,000 annual salary and three years before he would become eligible for the benefits (such as health and retirement) that accrue from career federal employment. In fact, Mr. Albury was not motivated by *any* personal advantage, and has not attained any through his illegal conduct.

Nor did Mr. Albury seek to aid any foreign government or opponent of the U.S., or to endanger anyone, imminently or otherwise. Nor has the government identified any cognizable harm from Mr. Albury's disclosures. Rather, his objective in disclosure was to alert the U.S. public to practices and procedures that he believed represented both a systemic departure from the FBI's proper mission in counterterrorism, and abuses of the enormous investigative authority the FBI has been granted since 9/11.

Mr. Albury's disclosures reflected his conclusion that on balance disclosure was a better long-term solution for the U.S. and the FBI's responsibility to protect U.S. security and investigate wrongdoing. In that sense, Mr. Albury's motivation was patriotic, and lacking in any malevolent objective or intent to harm.

---

[87] *See also United States v. Singh*, 877 F.3d 107, 2017 WL 6327823, at *9 (2d Cir. 2017) ([a] defendant's motivation for engaging in criminal conduct is unquestionably a proper consideration at sentencing); *Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993); *United States v. Mahan*, 2007 WL 1430288, at *3 (10th Cir. 2007) (sentence was procedurally unreasonable where district court refused to consider defendant's stated motive for possessing unloaded shotgun, *i.e.*, that he had been violently beaten by three men and sought to defend his wife); *United States v. Milne*, 384 F. Supp. 2d 1309, 1310-11 (E.D. Wis. 2005) (granting variance where "defendant did not take the bank's money out of greed or a desire to live a lavish lifestyle, [but in effort] to keep a sinking business afloat"); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (defendant did "not act for personal gain or for improper personal gain of another").

Conversely, the impact of Mr. Albury's disclosures has not been negative (except for Mr. Albury). As noted above, the government has yet to articulate any intended or actual harm as a result of Mr. Albury's disclosures. Nor has the government claimed or provided evidence that as a result of the disclosures it government was compelled to take any remediating action to protect anyone or any particular surveillance or investigative technique. In fact, the issues exposed by Mr. Albury were already in some respects in the public domain, and the subject of controversy.

In that context, any embarrassment suffered by the FBI as a result of Mr. Albury's disclosures would not constitute a legitimate basis for a prison sentence for him. The rules covering classified information make that clear: the executive order governing classification prohibits classifying information to "conceal violations of law, inefficiency, or administrative error," or to "prevent embarrassment to a person, organization, or agency." Exec. Order No. 13526 §1.7(a)(1)–(2), 75 Fed. Reg. 707, 710 (Dec. 29, 2009).

3. <u>Backdrop of Racism in the FBI and Barriers to Reporting Upwards</u>

Mr. Albury's conduct must also be viewed against the backdrop of systemic racism in the FBI and the documented obstacles to reporting concerns and perceived illegality up the chain of commad. Mr. Albury's personal experience in his FBI career compelled his conclusion that in certain important respects the FBI's counterterrorism strategy bred distrust, rather than confidence, in Muslim and immigrant communities, and alienation of those communities rather than cooperation. Ultimately, those defects impair the FBI's mission and impedes coordination with those communities in combating extremism.

In tandem with that perspective, Mr. Albury, as an African-American FBI agent, also experienced steady and pernicious racism from within the FBI itself. He also witnessed

religious bias by FBI agents against Muslims, and Somalis in particular. Those prejudices led not only to abuses, but also to a decidedly less productive counterterrorism program.

Unfortunately, as documented above,[88] the FBI has long suffered from a recognized racial bias against African-Americans. The scarcity of African-American FBI agents leads to isolation of those few who must exist within the enduring FBI culture, and they are consequently often more sensitive to discrimination in the FBI's investigative targeting and practices. Those twin problems weighed heavily on Mr. Albury, and increasingly so over time.

4. Aberrational Conduct and First-Time Offender

In addition, Mr. Albury's disclosures, while not a single, spontaneous act, nevertheless represent aberrant behavior on his part when compared with the rest of his life and otherwise stellar career. Such aberrant behavior also qualifies as a mitigating factor at sentencing.[89]

Mr. Albury's status as a first offender also warrants a sentence well below the Guidelines. The Commission has recognized the advisability of revising the guidelines to take first offender status and age into account.[90]

D. Mr. Albury's History And Characteristics

After *Booker*, as the Eighth Circuit emphasized in *United States v. Burns*, 577 F.3d 887 (8th Cir. 2009), the district court's discretion under 18 U.S.C. § 3553(a) "is near its zenith," in part, because the court "has discretion to consider virtually unlimited information." 577 F.3d

[88] *See* pp. 23 to 27.
[89] *See, e.g.*, *United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (variance based on "isolated mistake" in otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (defendant was a "law abiding citizen, who [did] an incredibly dumb thing"); *United States v. Davis*, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) (defendant was a first offender who had worked throughout his 15-year marriage to educate his six children and whose offense was prompted by economic pressures).
[90] *See U.S.S.C. Public Data Briefing: Proposed 2017 First Offenders & Alternatives to Incarceration Amendment,* January 9, 2017, available at https://www.ussc.gov/education/videos/first-offenders-and-alternatives-incarceration-data-briefing (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure"); U.S.S.C. *Measuring Recidivism* (May 2004) at 16, available at https://www.ussc.gov/research/research-publications/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelines (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power of the guidelines "if incorporated into the criminal history computation").

at 903-04, *citing* 18 U.S.C. § 3661. Several aspects of Mr. Albury's personal history merit a below-guidelines sentence here.

The portrait of Terry Albury that emerges from his personal history and the statements of his friends, former teachers and family is of a man of exemplary character, who has demonstrated a strong study and work ethic from an early age, and dedicated himself to a life of public service and helping others. He is repeatedly described as someone always willing to lend a helping hand, a good listener, a protector of the vulnerable, empathic to those in need, a leader by example, a perfectionist who has consistently held himself to the highest standards.[91] Former fellow students and teachers recall his generosity in giving his time to tutor those falling behind, play with the younger students, or just provide simple encouragement. His perfectionism and dedication is evident in his educational and professional achievements, including the numerous awards he has garnered as an FBI agent.

All speak highly of Mr. Albury's sense of community, his strong principles and his integrity. The child of a political refugee, he has always cared deeply about social justice, human rights and the rule of law -- values inculcated in him as a boy by his mother, and which afforded him a multicultural and inclusive perspective on our increasingly diverse society. It was this deep-seated sense of justice that found expression in his college work with under-privileged children in Appalachia and in researching community policing. This led to his desire to become an FBI agent - a role he believed would allow him do good and help others. The FBI were the "good guys."[92]

Moreover and paradoxically, it was Mr. Albury's code of morality and commitment to the rule of law that drove this offense. He simply could not reconcile these core beliefs with

---

[91] *See* pp. 5 to 10.
[92] Sachs Report at 10.

the widespread racist and xenophobic sentiments he observed throughout the white-male-dominated FBI, and more importantly, the discriminatory practices and policies he observed and implemented in the FBI's counter-terrorism strategies.

His morality, through the prism of his family and cultural history, generated the extreme discomfort he experienced in standing by and participating in practices and policies he disagreed with, leading ultimately to the stress-related psychological illnesses outlined in the Sachs Report. Mr. Albury believed he had become complicit with immoral and unconstitutional conduct, and had become a harm-doer himself.

Professionally isolated, lacking the perspective that comes with counseling or peer support, and feeling deeply depressed, but still seeking a role in which he can achieve positive change, Mr. Albury found himself in a state of moral conflict from which he could see no clear way forward or out. Critically, since the execution of the search warrant at his home and his firing from the FBI, Mr. Albury has found solace and peace through counseling, family support and spiritually.

As Dr. Sachs emphasizes, his offense represented for him "an impossible conflict between protecting the public and protecting his family," and based on that, "there is no evidence that Mr. Albury wished to impede or undermine the effectiveness of the FBI or its personnel."[93]

Mr. Albury's family circumstances also militate in favor of a non-custodial sentence here. Mr. Albury is a devoted father to his two children, aged eight and four, respectively, and they will be devastated if separated from him. They are already aware of tensions and

[93] Sachs Report at 10.

uncertainty in the family situation, and it is taking a toll on them.[94] His marriage is strong and his wife speaks highly of Mr. Albury as a husband and a parent.[95] His mother attests to his attentiveness to the needs of, and affection for, his extended family.[96]

Finally, Mr. Albury's integrity is also reflected in his acceptance of responsibility, such that he waived indictment, motion practice and a trial. Fired from his position in the FBI, Mr. Albury will never have another opportunity to commit a crime like the offenses of conviction. But the Court can be confident on a broader level that Mr. Albury's fundamental good character and his strong family and social networks are an effective bulwark against any possibility of recidivism.

### E. The Purposes of Sentencing

#### 1. A Sentence of Probation Would Be "Sufficient, But Not Greater Than Necessary" to Accomplish the Statutory Objectives of Sentencing

The statutory purposes of sentencing would be best served by a sentence of probation for Mr. Albury. Incapacitation in this case does not require imprisonment, as Mr. Albury, having been dismissed from the FBI and forever barred from such employment, will never again be in a position to make the disclosures that constituted his offense conduct.[97]

Relatedly, there cannot be a serious contention that Mr. Albury presents a danger of recidivism. In addition to lacking the capacity to commit the same offense, nothing in Mr.

---

[94] PSR ¶ 48. Numerous reports and studies have documented the devastating impact on children of parental incarceration. See, e.g., American Bar Foundation, *Talking about Parental Incarceration at the White House: Creating a National Dialogue Between Researchers, Practitioners and Policy Makers*, 2013, available at http://www.americanbarfoundation.org/uploads/cms/documents/rl_vol._24_no._3_summer_2013web.pdf; Kristin Turney, *Stress Proliferation across Generations? Examining the Relationship between Parental Incarceration and Childhood Health*, 55 Journal of Health and Social Behavior 319 (2014), available at https://nrccfi.camden.rutgers.edu/files/Journal-of-Health-and-Social-Behavior-2014-Turney-302-19.pdf.

[95] PSR ¶ 53.

[96] *See* Letter of Arlene Albury (Exhibit B).

[97] *See, e.g., United States v. Olis*, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (granting substantial variance in part because "the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct.").

Albury's background suggests he is a candidate for any other misconduct. Indeed, Mr. Albury's status as a first offender whose first criminal conduct is at an older age than average is a factor that warrants a below-Guidelines sentence.[98]

Regarding punishment, the consequences of Mr. Albury's conviction are severe and lasting. He lost the only job he ever held as an adult; he is forever banned from work in his chosen field. He will be a felon, and will suffer the attendant collateral consequences that attend such a disposition. Moreover, his ignominy in that regard is public and lasting. In addition, the economic and psychological consequences of his offense conduct – commencing with his termination as an FBI Special Agent – alone constitute significant punishment. The case law also instructs that a sentencing court should consider a defendant's loss of profession and reputation.[99]

To the extent rehabilitation is necessary here, 18 U.S.C. §3582(a) requires that a sentencing court "recognize [that] imprisonment is not an appropriate means of promoting correction or rehabilitation."

---

[98] *See, e.g.*, *United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding below Guidelines sentence on basis of defendant's first-offender status); *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-Guidelines sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Urbina*, slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"); *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum*, 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); *United States v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

[99] *See, e.g.*, *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction).

These factors all implicate §3553(a)'s reference to the "kinds of sentences available," which in this case certainly includes probation, which could be combined with community service and/or a financial penalty. Nor should the Guidelines level for Mr. Albury – whether the government's or the defense's calculation – make probation any less appropriate a sentence. The SRA explicitly presents probation as a distinct type of sentence with independent value, not merely a lenient option to be used only in extraordinary cases. As a threshold matter, Congress did not want sentences of imprisonment to be imposed "where equally effective sentences involving less restraint on liberty would serve the purposes of sentencing." S. REP. 98-225, 77, 1984 U.S.C.C.A.N. 3182, 3260 (1983).

Congress also directed the Sentencing Commission to "promulgate . . . guidelines . . . for use of a sentencing court in determining the sentence to be imposed in a criminal case, including . . . a determination *whether* to impose a sentence to probation, a fine, *or* a term or imprisonment." 28 U.S.C. § 994(a)(1)(A) (emphasis added).

In those guidelines, the Commission was supposed to "establish a sentencing range that is consistent with all pertinent provisions of title 18." 28 U.S.C. § 994(b)(1). Congress further directed sentencing judges, "in determining *whether* to impose a term of imprisonment," to "consider the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. §3582(a). Thus, Congress intended the courts to first determine *whether* to imprison in light of the characteristics of the defendant, the circumstances of the offense, and all of the purposes of sentencing, considering probation as one of the "kinds of sentences available." 18 U.S.C. §3553(a)(1), (2), (3).

### 2. General Deterrence Would Not Be Advanced By a Sentence of Imprisonment Within the Advisory Guidelines Range

For several compelling reasons, Mr. Albury's sentencing does not present an opportunity for general deterrence. As detailed below, as a practical matter, the landscape of unauthorized disclosure by government employees is so littered with inconsistency, unpredictability, and arbitrariness – not to mention unfairness – that general deterrence cannot be achieved through a single, isolated sentence. Factors such as *who* discloses, and *why*, determine the issues of punishment, and even whether an offender is prosecuted at all, not to mention pardoned either before or after sentence is imposed.

The identity of the person making an unauthorized disclosure plays an important role in an agency's reaction: "[g]overnment agencies often respond more harshly to whistleblowers whose disclosures embarrass them than to those who put national security at risk. Perhaps the best example of that is former CIA Director David Petraeus, who pleaded guilty to a single misdemeanor – and served no jail time – for sharing his highly classified journals with his biographer and lover and then lying to the FBI about it."[100]

Even Mr. Comey, in his recent book *A Higher Loyalty* (2018), concedes that "Petraeus was treated under a double standard based on class. . A poor person, an unknown person – say a young black Baptist minister from Richmond – would be charged with a felony and sent to jail." [101] Similarly, James Cartwright, a retired Marine Corps general who was investigated for disclosing information to a *New York Times* journalist, pleaded guilty only to lying to the FBI

---

[100] *FBI's Race Problems, supra.*
[101] *The FBI's Race Problems, supra.*

during the investigation, and was pardoned prior even to imposition of sentence. *See FBI's Race Problems*. Mr. Comey himself may be benefitting from that double standard.[102]

Even those who followed proper procedure before disclosing to the media have been prosecuted. Thomas Drake, a former NSA employee, "tried all formal channels available to him when he became convinced of wrongdoing at the agency[,]" including "his bosses, the NSA's inspector general, the Defense Department's inspector general, and congressional intelligence committees."[103] He eventually informed the *Baltimore Sun*, and was subsequently charged. The felony charges were dropped, though, and he pleaded guilty to the misdemeanor of exceeding the authorized use of a government computer.

As Jesslyn Radack, a former Justice Department lawyer and whistleblower who is now a defense attorney, stated, "[h]igher-level officials routinely leak sensitive – sometimes even classified – information to advance their own personal interests and rarely face serious consequences.[104] But if a whistleblower leaks sensitive information of public interest, the hammer comes down."[105] According to Ms. Radack, "[t]he outcomes have everything to do with politics and nothing to do with justice."[106]

---

[102] *See* Alex Pappas, "'*Clear Double Standard': As Comey denies illegally leaking memo, others prosecuted for mishandling classified material*," *foxnews.com*, April 27, 2018, available at http://www.foxnews.com/politics/2018/04/27/clear-double-standard-as-comey-denies-illegally-leaking-memo-others-prosecuted-for-mishandling-classified-material.html ("Comey denies leaking classified information. But *The Wall Street Journal* reported that at least two of the memos he shared have been to found to contain material now deemed classified")

[103] *FBI's Race Problems, supra.*

[104] *Clear Double Standard, supra.*

[105] *Id.*

[106] *Id.*

Earlier this year, former the DoJ IG issued a report regarding unauthorized disclosure – and subsequent serial lying, including under oath – by (former) FBI Deputy Director Andrew McCabe.[107]

The *McCabe Report* addressed the accuracy of statements made by then-Federal Bureau of Investigation (FBI) Deputy Director Andrew McCabe to the FBI's Inspection Division (INSD) and the Department of Justice (Department or DOJ) Office of the Inspector General (OIG) concerning the disclosure of certain law enforcement sensitive information to reporter Devlin Barrett that was published online in the Wall Street Journal (WSJ) on October 30, 2016, in an article entitled "FBI in Internal Feud Over Hillary Clinton Probe."

The *McCabe Report* "concluded that McCabe's disclosure of the existence of an ongoing investigation in this manner violated the FBI's and the Department's media policy and constituted misconduct" in addition to finding several instances of "lack of candor."[108] All of this occurred while the FBI was vigorously investigating and charging Mr. Albury. As yet, Mr. McCabe, while dismissed from the FBI, has not been charged with any criminal offense for his misconduct.

Also contemporaneous with the investigation and prosecution of Mr. Albury, April 30, 2018, the DoJ OIG posted on its web site,[109]an investigative summary, entitled "Findings of Misconduct by an FBI Special Agent for Contacting Witnesses for an Improper Purpose, Divulging Law Enforcement Sensitive Information to Unauthorized Individuals, Providing Misleading Testimony, Providing False Information to the OIG, Mishandling Classified Information, and Misusing Government Devices and his Position[,]" disclosing that an FBI

---

[107] *See* Office of the Inspector General, U.S. Department of Justice, "*A Report of Investigation of Certain Allegations Relating to Former FBI Deputy Director Andrew McCabe*," Oversight & Review Division, February 2019 (hereinafter "*McCabe Report*"), available at https://oig.justice.gov/reports/2018/o20180413.pdf..
[108] *Id.*
[109] Available at https://oig.justice.gov/reports/2018/f180430.pdf.

Special Agent, "who has since retired, may have contacted witnesses during a federal criminal investigation for an improper purpose."

The subject of the findings also had "contacts with several individuals appeared to be designed to improperly influence their prospective testimony[,]" and "divulged law enforcement sensitive information to unauthorized individuals; misused his government issued electronic devices; provided misleading testimony during a related civil deposition; mishandled classified information; misused his position during contacts with local law enforcement officers; and provided false information to the OIG." Nevertheless, the OIG reported, without any further elucidation, "[c]riminal prosecution of the SA was declined."

This double standard that precludes any prospect of general deterrence being effected in any even-handed or fair manner, also existed prior to Gen. Petraeus's case. In 2005, Sandy Berger, President Clinton's National Security Advisor, was permitted to plead guilty to a misdemeanor for sneaking a classified document out of a secure facility, and then destroying the document.[110]

A decade later, under a different presidential administration (and political party), the DoJ OIG conducted an investigation into the (former) Attorney General's mishandling of classified documents, and dubious statements in the course of the inquiry.[111] As the *Gonzales Report* relates, "[t]he allegations initially concerned Gonzales's handling of a document that contained classified information about a sensitive intelligence program generally referred to in this report as the NSA surveillance program. The surveillance program is administered by the

---

[110] John Harris & Allan Lengel, *Berger Will Plead Guilty To Taking Classified Paper*

[111] *See* Office of the Inspector General, Oversight and Review Division, U.S. Department of Justice, "Report of Allegations of Mishandling of Classified Documents by Attorney General Alberto Gonzales," September 2, 2008 (hereinafter "*Gonzales Report*"), available at https://oig.justice.gov/special/s0809/final.pdf.

National Security Agency (NSA) and is classified at the Top Secret/Sensitive Compartmented Information (TS/SCI) level."

In addition, "[d]uring the course of the OIG investigation, [the investigators] learned of several other classified documents that Gonzales may have mishandled. Most of these documents also concerned the NSA surveillance program. Other documents concerned a detainee interrogation program also classified at the TS/SCI level." As the *Gonzales Report* explains, the OIG "investigation concluded that Gonzales mishandled classified materials regarding two highly sensitive compartmented programs." It also "found that Gonzales improperly stored other highly classified documents about the two compartmented programs in a safe at the Department that was not located in a [Secure Compartmentalized Information Facility]. *Id.* That conduct "violated Department security requirements and procedures." *Id.*

While the *Gonzales Report* noted that the "Federal Criminal Code contains statutes relating to the improper handling of classified documents[,]" and that OIG had as a result provided its report to DoJ'a "National Security Division for its review[,] . . . the National Security Division declined prosecution." *Id.*

The double standards and unpredictability of sanctions – and their durability – has been exacerbated by exercise of the pardon power this year alone. In April, Scooter Libby, who in 2007 was "convicted of lying to investigators and obstruction of justice following the 2003 leak of the identity of CIA operative Valerie Plame[,]" was granted a full pardon (even though his prison sentence was commuted by President Bush before it commenced).[112]

A month earlier, former Petty Officer First Class Kristian Saucier, who had "pleaded guilty in May 2016 to two felony counts, one for unlawful retention of national defense

[112] *See* Associated Press, "*Trump Pardons Cheney Aide Scooter Libby*," *The New York Times*, April 13, 2018, available at https://nyti.ms/2IU0GSf.

information and another for obstruction of justice, for taking cellphone pictures inside the Navy vessel and later destroying his own equipment upon learning he was under investigation[,]" was pardoned.[113]

Other disclosures that have escaped any sanction – even prosecution or discipline of any type – only add to the disarray. In fact, certain New York-based FBI agents were *placated* rather than punished by Mr. Comey despite their disclosures to the media regarding aspects of the 2016 investigation into Hillary Clinton's use of a private email server (and whether that compromised classified information).[114] According to the *Talking Points Memo* article, the rogue agents' animosity towards Mrs. Clinton motivated Mr. Comey to break with protocol and disparage Mrs. Clinton in his public statement announcing that the government had declined to prosecute her.[115] *Id*.

Even institutionally, a double standard exists. Earlier this year in a submission in federal court, the CIA asserted it "has the right to disclose classified information to selected journalists and then to withhold the same information from others under the Freedom of Information Act."[116] The CIA wrote, that "[t]he Court's supposition that a limited disclosure of information to three journalists necessarily equates to a disclosure to the public at large is

---

[113] Cristiano Lima, "*Trump Pardons Sailor in Submarine Photos Case*," *Politico*, March 9, 2018, available at https://www.politico.com/story/2018/03/09/donald-trump-kristian-saucier-pardon-450484; *see id.* ("[c]ritics have cited [Mr. Saucier's prosecution] to allege a double standard in how low-and high-ranking U.S. officials handle sensitive material."). *See also* **Error! Main Document Only.**Office of the Inspector General, U.S. Department of Justice, "A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election," Oversight and Review Division 18-04, June 2018, at 387, available at https://www.justice.gov/file/1071991/download (noting testimony by former Attorney General Loretta Lynch that she informed Mr. Comey that she was "troubled [by] this issue, meaning the, the New York agent issue and leaks," and her conversations with Mr. Comey about it).
[114] *See* Josh Marshall, "*You Guys Are Finally Going to Get That Bitch*," *Talking Points Memo*, June 18, 2018, available at https://talkingpointsmemo.com/edblog/you-guys-are-finally-going-to-get-that-bitch.
[115] *See also* Nancy LeTorneau, "How Rogue at the FBI Influenced the Election," *Washington Monthly*, June 18, 2018, available at https://washingtonmonthly.com/2018/06/18/how-rogue-agents-at-the-fbi-influenced-the-election/.
[116] "CIA Defends Selective Disclosure to Reporters," *fas.org*, February 15, 2018, available at https://fas.org/blogs/secrecy/2018/02/cia-selective-disclosure/.

legally and factually mistaken."[117] Thus, selectivity in disclosure, prosecution, and punishment is the norm in the intelligence community, and Mr. Albury's sentence will not rectify that problem, and as a result it is respectfully submitted that his sentence should not include any element of general deterrence.

As a result, in this environment, absent any predictability or consistency in the treatment of those who disclose or mishandle classified material, other recent sentences do not provide any guidance, and regardless of intention, cannot achieve general deterrence amid the confusion. Thus, neither the 63-month prison term imposed on Reality Winner this summer – a term that was fixed in the plea agreement,[118] nor the 66-month sentence imposed on Nghia Pho for taking "massive troves" of classified documents home that were downloaded from his computer by Russian hackers, provide justification for either a Guidelines sentence for Mr. Albury, or any component therein for general deterrence.[119]

3. Ongoing Disclosures, Made for Political Purposes, Send Markedly Mixed Messages That Eliminate the Possibility of General Deterrence

The inconsistencies and double standard catalogued above have been aggravated and amplified by the decidedly mixed messages conveyed by the clearly political declassification of certain intelligence documents. Again, just this year, the Trump administration declassified a significant portion of an affidavit in support of an application for an eavesdropping warrant

[117] *Id.* The article also mentioned that "[s]elective disclosure of classified information to uncleared reporters is a more or less established practice that is recognized by Congress, which has required periodic reporting to Congress of such disclosures."

[118] *See* Charlie Savage and Alan Blinder, "*Reality Winner, N.S.A. Contractor Accused in Leak, Pleads Guilty*," *The New York Times*, June 26, 2018, available at https://www.nytimes.com/2018/06/26/us/reality-winner-nsa-leak-guilty-plea.html – which prosecutors reportedly said "was the longest ever imposed in federal court for an unauthorized release of government information to the media[,];" Dave Philipps, "*Reality Winner, Former N.S.A.Translator, Gets More Than 5 Years in Leak of Russian Hacking Report*," *The New York Times*, August 23, 2018, available at https://www.nytimes.com/2018/08/23/us/reality-winner-nsa-sentence.html.

[119] *See* Scott Shane, "He Took Home Documents to Catch Up on Work at the N.S.A. He Got 5½ Years in Prison," *The New York Times*, September 25, 2018, available at https://nyti.ms/2NOYYAs.

pursuant to the Foreign Intelligence Surveillance Act (hereinafter "FISA").[120] That represented an unprecedented disclosure; in the 40-year history of FISA. Earlier, despite objections from the intelligence community, President Trump had ordered the declassification of a Congressional memorandum,[121] and last month belatedly (after additional protests from intelligence agencies) withdrew another directive to declassify additional FISA material.[122]

Moreover, President Trump has tweeted with respect to a number of these situations, including those related to Mr. Comey and Mr. McCabe, and the declassification of FISA materials and the Congressional memo, further contributing to the chaos regarding standards for investigation, prosecution, and punishment for unauthorized disclosure. President Trump also tweeted that that 63-month (agreed-upon) sentence imposed on Reality Winner was "so unfair" and her disclosure were "'small potatoes' compared to what Hillary Clinton did!"[123]

4. Longer Sentences Are Not Effective In Deterring an Act of Conscience

A recent highly publicized event demonstrates that the prospect of serious sanctions is not effective at deterring acts of conscience such as that by Mr. Albury in this case. During confirmation hearings for Supreme Court nominee Brett M. Kavanaugh, Senator Cory Booker (D-NJ) questioned Judge Kavanaugh about and released certain emails in violation of Senate

---

[120] Katie Rogers and Emily Cochrane, "*Without Evidence, Trump Claims Vindication From Release of Carter Page Documents,*" *The New York Times*, July 22, 2018, available at https://www.nytimes.com/2018/07/22/us/politics/trump-fisa-carter-page.html.

[121] *See* Josh Gerstein, "*Trump declassification of GOP memo could lead to cascade of disclosures*," *Politico*, February 15, 2018, available at https://www.politico.com/story/2018/02/15/trump-gop-memo-fbi-investigations-disclosures-415596 ("a federal judge [said in the context of ongoing litigation] the president's move had undermined government arguments that it should be able to keep mum about its ongoing investigations").

[122] *See* Max Zapotosky, Devlin Barrett, and Karoun Demirjian, "*Trump orders Justice Dept. to declassify Russia-related material*," *The Washington Post*, September 17, 2018, available at https://www.washingtonpost.com/world/national-security/trump-orders-justice-dept-to-declassify-russia-related-material/2018/09/17/661b7c78-bac1-11e8-9812-a389be6690af_story.html?utm_term=.a3c7d18b4c17.

[123] *See* Billy Perrigo, "*President Trump Calls 5-Year Prison Sentence for NSA Whistleblower Reality Winner 'Unfair*,'" *Time Magazine*, August 24, 2018, available at http://time.com/5377202/donald-trump-reality-winner-sentence-unfair/.

rules.[124] Cognizant of the infraction, Sen. Booker announced, "I openly invite and accept the consequences of releasing that email right now . . . The emails being withheld from the public have nothing to do with national security." *Id.* Senator John Cornyn (R-Tex.) responded, "this is no different from the senator deciding to release classified information that is deemed classified." *Id.*

Sen. Booker replied, "Senator Cornyn made a very good point. I knowingly violated the rules that were put forth. I come from a long line, as all of us do as Americans, of understanding what that kind of civil disobedience is, and I understand the consequences."[125]

Sen. Booker's conduct confirms that those who act out of conscience in making disclosures will not be deterred by potential consequences if they believe their conduct is in the public interest, and that ordinary channels do not provide a viable option for correcting the problem and/or informing the public.

### 5. Academic and Social Science Research Establishes That There Is Not Any Empirical or Clinical Evidence to Support the Contention That Longer Sentences Achieve General Deterrence

While general deterrence is an express component of so many sentences, including white collar cases, and even those in which defendants lack any previous experience with the United States and/or its criminal justice system, there is not any research or clinical evidence that justifies enhancing a particular defendant's sentence based on general deterrence.[126]

---

[124] *See* Seung Min Kim, Ann Marimow, and Mark Berman, "*Supreme Court Nominee Declines to Condemn Trump's Attacks on Judiciary*," *The Washington Post*, September 6, 2018, available at https://www.washingtonpost.com/powerpost/kavanaugh-hearing-trumps-supreme-court-nominee-faces-second-day-of-questioning/2018/09/06/3529677a-b147-11e8-aed9-001309990777_story.html?utm_term=.d60964307d6a&wpisrc=nl_most&wpmm=1.

[125] Philip Bump, "*Cory Booker's Senate Rules Drama, Explained*," *The Washington Post*, September 6, 2018, available at https://www.washingtonpost.com/politics/2018/09/06/cory-bookers-dramatic-violation-senate-rules-explained/?utm_term=.8a32bd79a8eb. *See also id.* (Sen. Booker added, "I understand that, that the penalty comes with potential ousting from the Senate").

Also, academic literature and clinical research concur that no greater degree of deterrence would be attained by a Guidelines prison sentence compared with a sentence well below that term, or of probation. Research has consistently established that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[127]

Nor would a sentence for Mr. Albury – or any increase in his sentence at all – based on general deterrence be fair or consistent. Indeed, general deterrence *creates* disparity because of its entirely subjective character. Its influence on others – or even their exposure to the information – cannot be predicted; the extent of any such success cannot be measured or quantified; it is not standardized in the Guidelines or anywhere else, as an enhancement for general deterrence would not be based on any rational or measurable metric; and it cannot be calibrated efficiently or fairly.

What one district court determines is sufficient to achieve general deterrence may be twice as much or twice as little as another court's determination. Relying on "general deterrence" to impose a Guidelines sentence, without calibrating the point at which any prospect of general deterrence is exhausted, is bound to create a disparity to Mr. Albury's detriment and heap further unnecessary and unwarranted punishment upon him.

As a result, in this case general deterrence represents a recipe for disparity untethered to any objective standard or ability to compare to other cases and defendants and, consequently, contravenes §3553(a)(6). Therefore, it should not be a factor in Mr. Albury's sentencing.

---

[126] *See* Michael J. Lynch, *Beating a dead horse: Is there any basic empirical evidence for the deterrent effect of punishment?*, 31 Crime, Law & Social Change 347 (1999) (hereinafter "*Beating a dead horse*"), at 355 ("[m]ost assuredly, the assumption that a lesser increase in the rate of incarceration would have caused an inflated rate of offending *is just that* – an *assumption* or assertion *which cannot be demonstrated* except with data that make a great many assumptions about how individuals *might* behave given some set of *hypothetical* circumstances") (emphasis in original).

[127] Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).

### 6. The Sentencing Commission's Most Recently Published Sentencing Statistics Demonstrate That a Guidelines Sentence Here for Mr. Albury Would Create An Unwarranted Disparity

The United States Sentencing Commission publishes each quarter an abstract of federal sentencing statistics entitled *U.S. Sentencing Commission Quarterly Data Report*. The most recent figures are contained in the *2d Quarter Release, Quarterly Data Report, Preliminary Fiscal Year 2018 Data Through March 31, 2018* (hereinafter "*Q2 Preliminary Data Report 2018*"), which covers sentences imposed between January 1, 2018 and March 31, 2018, and demonstrates that the Guidelines no longer constitute the predominant factor in a clear majority of sentences in the District of Minnesota ("DMN") (or the Eighth Circuit as a whole).[128]

For example, the *Q2 Preliminary Data Report 2018* reveals that between January 1, 2018 and March 31, 2018, within the Eighth Circuit, 56.7% of sentences were *below* the calculated Guidelines range. *See Q2 Preliminary Data Report 2018*, at 13.[129] In DMN, with only 37.2% of sentences within range, a clear majority of sentences, 62.1%, were below the Guidelines range. *Id*. Thus, in DMN, a sentence *below* the Guidelines range is the overriding *norm*, and *not* the exception. Even excluding those below-Guidelines sentences based on government-sponsored motions – 16.2% of DMN sentences,[130] including motions pursuant to §5K1.1 and §5K3.1 – the trend of imposing below-Guidelines sentences in DMN is still apparent.

Non-government sponsored factors, including §3553(a) factors, Guidelines downward departures, and/or a combination thereof, were responsible for 38.5% of sentences. *See id*.

---

[128] The *Q2 Preliminary Data Report 2018* is available at <https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_2nd_18_Final.pdf>. Prior *Quarterly Data Reports* are also available on the Sentencing Commission's web site, www.ussc.gov.

[129] Nationally, for that time period, 50% of sentences were *within* the Guidelines range. *Q2 Preliminary Data Report 2018*, at 12.

[130] The percentages are of *all* sentences within the District, as that is how the figures are presented in the *Preliminary Data Report*.

Therefore, of all the below-Guidelines sentences imposed in DMN between January 1, 2018 and March 31, 2018, well more than half (approximately 62%) were imposed based on non-government sponsored factors.

Notably, the sentencing statistics for Fiscal Year 2017 (spanning October 1, 2016 to September 30, 2017), reveal that the trend of imposing below-Guidelines sentences is even more robust when the statistics are drawn from a full year of sentences, rather than the three months covered in the most recent statistical report (*Q2 Preliminary Data Report 2018*). *See 2017 Sourcebook of Federal Sentencing Statistics*, Fiscal Year 2017 (hereinafter "*Sourcebook*"), available at <https://www.ussc.gov/research/sourcebook-2017>.

In fact, the *Sourcebook* provides significantly more detailed information on the sentences imposed. In the Eighth Circuit as a whole in Fiscal Year 2017, only 47.1% of sentences were within the Guidelines, with just 4.1% above the Guidelines range, and 48.7% of all sentences below the calculated Guidelines range. *Sourcebook*, Table N-8, at S-62. For Fiscal Year 2017, 61.1% of DMN sentences were below the Guidelines range. *See Id.*, at Table 26, at S76. Nationally for Fiscal Year 2017, 47.9% of sentences were below the Guidelines range. *Id.*, Table N-8, at S-62.

Also, Table 13 of the *2017 Sourcebook*, at S-32, entitled "Sentence Length In Each Primary Offense Category," provides data with respect to sentences nationally in each offense category for all of Fiscal Year 2017. Violations of 18 U.S.C. §793 are not delineated separately, but there is a category labeled "National Defense." Table 13, at S-32. In Fiscal Year 2017, 26.1% of sentences for "National Defense" offenses were within the Guidelines, while 73.8% were below the Guidelines, with 36.3% of all sentences – composing nearly half

(49%) of those below-guidelines sentences – based on factors other than a government-endorsed downward departure. *See id*., Table 27, at S79-80.

Regarding those figures for the period covered by the *Q2 Preliminary Data Report 2018*, only 25.5% of sentences for "National Defense" offenses (of which there were 47) were within the Guidelines range. *See Q2 Preliminary Data Report 2018*, at 15 (Table 10A). A mere 2.1% were above the Guidelines range, while 72.4% were *below* the Guidelines range – with 53.2% of those 47 sentences imposed below the Guidelines range based on factors other than a government-sponsored downward departure. *Id*.

Moreover, of those sentences for "National Defense" offenses that were below the Guidelines for reasons other than downward departures, *i.e.*, based on §3553(a) factors, the median sentence in months was 24 months, the median decrease from the Guidelines minimum was 35 months, and the median percent decrease from that Guidelines minimum was 60.9%. *Id*., at 24 (Table 16A).[131]

[131] For all offenses, the median percent decrease from the Guidelines minimum for sentences below the Guidelines for reasons other than a downward departure was 35.1%. *Q2 Preliminary Data Report 2018*, at 24 (Table 16A).

## Conclusion

For all the foregoing reasons, the Court should depart and/or vary below the applicable guideline, and sentence Mr. Albury to a non-custodial sentence.

Dated: October 4, 2018

Respectfully submitted,

/s/

JaneAnne Murray, Esq.
Minnesota Bar#: 0384887
Murray Law LLC
310 South Fourth Avenue, Suite 5010
Minneapolis, MN 55415
Tel: (612) 339-5160
Fax: (866) 259-7819
Email: jm@mlawllc.com

/s/

Joshua Dratel, Esq.
New York State Bar#: 1795954
Law Offices of Joshua L. Dratel, P.C.
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-0707
Fax: (212) 571-3792
Email: jdratel@joshuadratel.com